**Virginia L. KITTO, as surviving mother of Jeffrey Kitto, Deceased, and as special administrator of his Estate, Plaintiff/Appellant,**

v.

**MINOT PARK DISTRICT, Defendant/Appellee.**

Civ. No. 9030.

Supreme Court of North Dakota.

Dec. 5, 1974.

Rehearing Denied Dec. 30, 1974.

Pringle & Herigstad, P. C., Minot, for plaintiff/appellant.

Bosard, McCutcheon, Kerian, Schmidt & Holum, Ltd., Minot, for defendant/appellee.

Allen I. Olson, Atty. Gen., and Gerald W. Vande Walle, Asst. Atty. Gen., Bismarck, amicus curiae.

JOHNSON, Judge.

Jeffrey Kitto, age 12, was rescued from drowning in a duck pond within Theodore Roosevelt Park in the City of Minot, on June 25, 1970. However, as a result of his

near-drowning, Jeffrey remained in a coma for some twenty months and subsequently died. His mother brought action against the Minot Park District for damages, consisting of medical and funeral expenses, loss of services and companionship, pain and suffering. Mrs. Kitto alleged that the fence around the pond had been removed and that the unguarded, unfenced pond constituted an unsafe condition and an attractive nuisance for young children. Upon motion of the park district, the district court granted summary judgment against Mrs. Kitto on the ground that the park district had no liability insurance and was otherwise immune from tort claims under the previous decisions of this court.

This case presents us with the question of whether the legal doctrine of governmental immunity from tort liability to individual citizens should be sustained in North Dakota. With the limitations set forth in this opinion, we overrule Fetzer v. Minot Park District, 138 N.W.2d 601 (N.D. 1965), and other decisions supporting this doctrine,[1] and hold that governmental bodies, other than the state government, are subject to suit for damages to individuals injured by the negligent or wrongful acts or omissions of their agents and employees. In so doing we join a veritable host of courts which have abolished this doctrine.[2] We retain no distinction between governmental and proprietary functions.

I.

There is near unanimity of opinion among respected legal scholars and recent

1. Kaczor v. City of Minot, 138 N.W.2d 784 (N.D.1965); Taylor v. City of Devils Lake, 87 N.W.2d 401 (N.D.1958); Mayer v. Studer & Manion Co., 66 N.D. 190, 262 N.W. 925 (1935); Holgerson v. City of Devils Lake, 63 N.D. 155, 246 N.W. 641 (1933); Hadler v. North West Agricultural, etc. Ass'n, 61 N.D. 647, 239 N.W. 736 (1931); Hanson v. Berry, 54 N.D. 487, 209 N.W. 1002, 47 A.L.R. 816 (1926); Anderson v. Board of Education, 49 N.D. 181, 190 N.W. 807 (1922); Montain v. City of Fargo, 38 N.D. 432, 166 N.W. 416, L.R.A.1918C 600 (1917); Vail v. Town of Amenia, 4 N.D. 239, 59 N.W. 1092 (1894).

2. City of Fairbanks v. Schaible, 375 P.2d 201 (Alaska 1962) [interpreting statute]; Stone v. Arizona Highway Commission, 93 Ariz. 384, 381 P.2d 107 (1963); Parish v. Pitts, 244 Ark. 1239, 429 S.W.2d 45 (1968); Muskopf v. Corning Hospital District, 55 Cal.2d 211, 11 Cal.Rptr. 89, 359 P.2d 457 (1961); Evans v. Board of County Commissioners, 174 Colo. 97, 482 P.2d 968 (1971); Spencer v. General Hospital of District of Columbia, 138 U.S.App.D.C. 48, 425 F.2d 479 (1969); Hargrove v. Town of Cocoa Beach, 96 So.2d 130 (Fla.1957); Smith v. State, 93 Idaho 795, 473 P.2d 937 (1970) [proprietary and governmental distinction retained]; Molitor v. Kaneland Community Unit District No. 302, 18 Ill.2d 11, 163 N.E.2d 89 (1959); Campbell v. State, 284 N.E.2d 733 (Ind.1972) [state] (citing with approval Klepinger v. Board of Commissioners, 143 Ind.App. 155, 239 N.E.2d 160 (1968) [counties] and Brinkman v. City of Indianapolis, 141 Ind.App. 662, 231 N.E.2d 169 (1967) [municipalities]; Carroll v. Kittle, 203 Kan. 841, 457 P.2d 21 (1969) [proprietary and governmental distinction retained]; Haney v. City of Lexington, 386 S.W.2d 738 (Ky.1964) [municipal corporations]; Board of Commissioners of Port of New Orleans v. Splendour Shipping & Enterprises, 273 So.2d 19 (La.1973) [governmental boards and agencies]; Williams v. City of Detroit, 364 Mich. 231, 111 N.W.2d 1 (1961); Spanel v. Mounds View School District No. 621, 264 Minn. 279, 118 N.W.2d 795 (1962) [school districts, municipal corporations, and other political subdivisions]; Johnson v. Municipal University of Omaha, 184 Neb. 512, 169 N.W.2d 286 (1969) [cities, counties, other governmental subdivisions and local public entities—for conditions on premises]; Brown v. City of Omaha, 183 Neb. 430, 160 N.W.2d 805 (1968) [governmental subdivisions—motor vehicles]; Rice v. Clark County, 79 Nev. 253, 382 P.2d 605 (1963) [counties—negligent operation of roads]; Willis v. Department of Conservation and Econ. Dev., 55 N.J. 534, 264 A.2d 34 (1970) [state]; Ayala v. Philadelphia Board of Public Education, 453 Pa. 584, 305 A.2d 877 (1973) [local governmental units, municipal corporations and quasi corporations]; Becker v. Beaudoin, 106 R.I. 562, 261 A.2d 896 (1970) [municipal and quasi municipal corporations]; Holytz v. City of Milwaukee, 17 Wis.2d 26, 115 N.W.2d 618 (1962).

judicial opinions that the doctrine of governmental immunity has outlived its usefulness as a just instrument of governmental policy. The New Mexico Supreme Court offered a classic critique:

> " 'It is almost incredible that in this modern age of comparative sociological enlightenment, and in a republic, the medieval absolutism supposed to be implicit in the maxim, "the King can do no wrong", should exempt the various branches of the government from liability for their torts, and that the entire burden of damage resulting from the wrongful acts of the government should be imposed upon the single individual who suffers the injury, rather than distributed among the entire community constituting the government, where it could be borne without hardship upon any individual, and where it justly belongs.' " Barker v. City of Santa Fe, 47 N.M. 85, 136 P.2d 480, 482 (1943).

This court has also recognized the injustice that this rule perpetrates.[3] In Anderson v. Board of Education, 49 N.D. 181, 190 N.W. 807, 811 (1922), the court's reliance upon stare decisis had this effect:

> "It is regrettable, indeed, that William Anderson lost his life in the circumstances mentioned, that his mother has sustained an irreparable loss, and that, while it is a maxim of law that for every wrong there is a remedy, that maxim does not seem to hold true in this and similar cases. While the plaintiff's loss is a real one and the damages suffered by her are no doubt substantial, the law affords her no remedy. The law, in effect, says to her: You alone must bear this burden; that, even if substantial damages might in some small measure assuage the great burden imposed upon you, through no fault of yours, nevertheless, in order to protect the public, you, widowed though you be, must bear the burden alone."

■ In considering the doctrine of governmental immunity it is well to examine its origin. This is one of those legal points on which, as Justice Holmes observed, "a page of history is worth a volume of logic." The case to which legal scholars point as the source for this principle is the English decision of Russell v. Men of Devon, 2 T.R. 667, 100 Eng.Rep.R. 359 (1788). The court there refused recovery against an unincorporated county. As the case title indicates, there was no legal entity established and suit was brought against the citizenry. The court was fearful of an "infinity of actions" and concerned with the absence of a fund out of which to pay any judgment. Priority was given to the government over the individual. In 1812 a Massachusetts court, relying upon the *Russell* decision, held that an incorporated county was immune from liability for the tortious acts of its employees. Mower v. Leicester, 9 Mass. 247. Though the political subdivisions now had corporate powers, funds, tax authority, and substantial obligations and activities, the *Mower* case became the common law of the various states with few exceptions. By an interesting quirk of legal history, the English courts subsequently allowed tort actions against municipalities and school districts.[4] The question of governmental liability in tort was considered in 1884 by the Supreme Court of the Dakota Territory. In that case a verdict of $1500 for a broken leg was

---

**3.** While the attorney general, in his amicus brief requested by this court, has argued for sustaining the doctrine based upon our existing law, he has properly noted that: "The doctrine of governmental immunity in North Dakota is legally viable but morally wrong and discriminates against those of our citizens who encounter state or local government entities which have failed to avail themselves of the liability protection permitted but not required by statute." Amicus Brief of Attorney General, at 19.

**4.** Lyme Regis v. Henley, 2 Clark & F. 331 (6 Eng.Rep. 1180, 1 Eng.Rul. Case 601) (1834); Shrimpton v. Hertfordshire County Council (1911), 104 Law Times Rep. 145 (2 N.C. C.A. 238); Ching v. Surrey County Council (1910), 1 K.B. 736 (2 N.C.C.A. 229); Morris v. Carnarvon County Council (1910), 1 K.B. 840 (2 N.C.C.A. 234); Smith v. Martin and

sustained against the City of Grand Forks. The court held that municipal corporations were liable for lack of reasonable care in maintaining their streets and highways. Larson v. City of Grand Forks, 3 Dak. 307, 19 N.W. 414 (1884). Subsequently, in 1893, the question was presented to the Supreme Court of North Dakota in a suit against the City of Fargo. Citing the *Larson* case, the court held that municipal corporations were liable for their wrongful acts even without an express statute authorizing suit. Ludlow v. City of Fargo, 3 N.D. 485, 57 N.W. 506 (1893). The first case denying governmental liability was the case of Vail v. Town of Amenia, 4 N.D. 239, 59 N.W. 1092, 1094 (1894). It was there held that municipal corporations are liable in tort, as recognized by the *Ludlow* case, but quasi-municipal corporations, such as counties, townships, towns and school districts, are not. The court made an apt observation concerning the source for the immunity rule:

> "It may be true, and we think is true, that the case of Russell v. Men of Devon, 2 Term R. 667, so often cited as the source of the doctrine of nonliability of quasi municipal corporations for injuries resulting from defective bridges or highways, never was intended to be authoritative further than that the inhabitants of a certain territory designated as a county, but not incorporated, and having no corporate purse, could not be held liable for such injuries, and that the case is not an authority for nonliability of counties in this country, where counties are incorporated and have a corporate purse." 59 N.W. 1094.

Chief Justice Bartholomew noted, however, that the townships were then in the process of settlement and that a substantial judgment against a sparsely populated town or township could cause financial distress and retard its further development and settlement. In those circumstances it was thought appropriate that the individual should suffer rather than the public.

In subsequent cases the governmental immunity concept was mitigated by holding the governmental units liable for taking or damaging property without compensation. Township of Noble v. Aasen, 8 N.D. 77, 76 N.W. 990 (1898). A further modification of the liability of cities was introduced in the 1917 case of Montain v. City of Fargo, 38 N.D. 432, 166 N.W. 416, L.R.A.1918C 600. "Governmental" functions as opposed to "proprietary" or private functions were found to be immune from tort. Later cases provided a further modification of the immunity doctrine by recognizing liability for maintaining a public nuisance or an attractive nuisance. See Kinnischtzke v. City of Glen Ullin, 79 N.D. 495, 57 N.W.2d 588 (1953); Moulton v. City of Fargo, 39 N.D. 502, 167 N.W. 717, L.R.A.1918D 1108 (1918).

The first reference to a constitutional basis for immunity suit for governmental units was in 1924 in an action against the state,[5] and the first reference to a constitutional basis in the case of a governmental unit other than the state was in 1931.[6] The constitutional provision in question (Article I, Section 22, North Dakota Constitution) was not referred to in a tort action until 1958, and then in a suit against the state.[7]

As history reveals, the doctrine of governmental immunity in North Dakota has a judicial origin and has been judicially modified. The constitutional basis for this doctrine has been a more recent judicial construction. When other grounds have failed, the state constitutional provision has been thrown into the breach to sustain a crumbling legal concept.

## II.

A major question to be resolved in our examination of governmental immunity in

---

the Corporation of Kingston-Upon-Hull (1911), 2 K.B. 775 (2 N.C.C.A. 215).

**5.** Wirtz v. Nestos, 51 N.D. 603, 200 N.W. 524 (1924).

**6.** Schilling v. Carl Tp., Grant County, 60 N.D. 480, 235 N.W. 126 (1931).

**7.** Spielman v. State, 91 N.W.2d 627 (N.D. 1958).

North Dakota is: To what extent is the doctrine based on constitutional provisions? Section 22, Article I, North Dakota Constitution, provides:

"All courts shall be open, and every man for any injury done him in his lands, goods, person or reputation shall have remedy by due process of law, and right and justice administered without sale, denial or delay. *Suits may be brought against the state in such manner, in such courts, and in such cases, as the legislative assembly may, by law, direct.*" [Emphasis supplied.]

The latter portion of this section was relied upon by the court in its last decision sustaining the doctrine of governmental immunity. Fetzer v. Minot Park District, 138 N.W.2d 601 (N.D.1965).

However, the Wisconsin Supreme Court, in examining a very similar constitutional provision,[8] recognized a well-established distinction between sovereign immunity as applied to the state and governmental immunity as applied to other political subdivisions. Holytz v. City of Milwaukee, 17 Wis.2d 26, 115 N.W.2d 618 (1962); City of Kenosha v. State, 35 Wis.2d 317, 151 N.W.2d 36 (1967); Forseth v. Sweet, 38 Wis.2d 676, 158 N.W.2d 370 (1968); Cords v. State, 62 Wis.2d 42, 214 N.W.2d 405 (1974). Construing the constitutional provision to relate only to the sovereign immunity of the state, the Wisconsin court abolished governmental immunity as a defense for other political subdivisions. Holytz v. City of Milwaukee, *supra.*[9]

In May and June of 1973 the Pennsylvania Supreme Court decided two cases relating to the doctrines of sovereign immunity of the state and governmental immunity as to units of local government. Brown v. Commonwealth, 453 Pa. 566, 305 A.2d 868 (1973); Ayala v. Philadelphia Board of Public Education, 453 Pa. 584, 305 A.2d 877 (1973). The Pennsylvania constitutional provision then in question is virtually identical to our own.[10] In Ayala v. Philadelphia Board of Education, *supra,* the court held that the doctrine of governmental immunity was abolished. Brown v. Commonwealth, *supra,* upheld the doctrine of sovereign immunity of the state on the ground that the abrogation or modification of this immunity was constitutionally vested in the legislature. In the latter case three dissenting justices argued that sovereign immunity was not constitutionally mandated and should have been abolished.

■ The distinction between sovereign immunity of the state alone and governmental immunity as applied to other political subdivisions has found broad recognition in the courts. See e. g., Parish v. Pitts, 244 Ark. 1239, 429 S.W.2d 45 (1968); Evans v. Board of County Commissioners, 174 Colo. 97, 482 P.2d 968 (1971); Spanel v. Mounds View School District No. 621, 264 Minn. 279, 118 N.W.2d 795 (1962). As the Supreme Court of Arkansas observed:

**8.** "The legislature shall direct by law in what manner and in what courts suits may be brought against the state." Article 4, Section 27, Wisconsin Constitution.

**9.** Other constitutional provisions which have been held not to preclude judicial abolition of governmental immunity include the following:
"Provision may be made, by general law, for bringing suit against the State, as to all liabilities originating after the adoption of this Constitution; but no special act authorizing such suit to be brought, or making compensation to any person claiming damages against the State, shall ever be passed." Article 4, Section 24, Indiana Constitution. See Perkins v. State, 252

Ind. 549, 251 N.E.2d 30 (1969). "The state may sue and be sued, and the legislature shall provide by law in what manner and in what courts suits shall be brought." Article V, Section 22, Nebraska Constitution. See Brown v. City of Omaha, 183 Neb. 430, 160 N.W.2d 805 (1968).

**10.** "Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct." Article I, Section 11, Pennsylvania Constitution, P.S.
"Suits may be brought against the state in such manner, in such courts, and in such cases, as the legislative assembly may, by law, direct." Article I, Section 22, North Dakota Constitution.

"Of sovereignty as a reason for holding political subdivisions immune to suit, it is generally agreed in those decisions that cities and other such entities are not the state, and it is only to the state that the high attribute of sovereign immunity should properly be attributed." Parish v. Pitts, 429 S.W.2d 51.

The drafters of our state constitution took care to spell out powers and limitations that might be applicable to the state as opposed to municipalities and other political subdivisions. These entities are treated separately and distinctly by constitutional sections which expressly provide differing standards for the state and other political subdivisions, sections which restrict the authority of the state in favor of a subdivision, sections which allow state regulation only with the permission of a subdivision, sections which provide for the creation of political subdivisions, and sections which are intended to apply only to the state or to political subdivisions.[11] It is consistent with our constitutional framework to recognize that there are characteristics of sovereignty which attach to the operations of state government but not to various other independent or semi-independent governmental bodies.

■ We are persuaded that a reconsideration of the constitutional basis for governmental immunity establishes that this doctrine, as distinguished from sovereign immunity of the state itself, is not constitutionally mandated.

### III.

■ The argument is made that we here may invade the province of the legislature by abrogating the doctrine of governmental immunity. With due concern for our system of separation of powers, an examination of this contention appears in order. It has been noted that the legislature has provided for a method of filing claims against municipal corporations for injury from defective streets, sidewalks or bridges. Sections 40–42–01, 40–42–02, 40–42–03, N.D. C.C. In addition, Section 40–43–07, N.D. C.C., authorizes political subdivisions to obtain liability insurance, and provides for waiver of immunity to the extent of such coverage. In construing this latter statute, this court made some observations concerning legislative intent:

11. *Section 130 authorizes the creation of municipal corporations as distinct units. The various sections of Article X provide for the organization of counties and townships.*

Debts of the various subdivisions, including counties, townships, cities, towns and school districts are treated apart from those debts incurred by the state in Sections 183, 184 and 187. Indebtedness of any subdivision is limited by Section 183 to five percent of the assessed value of the taxable property therein. Other restrictions are placed on debts incurred by the state, which are governed by Section 182.

Further evidence that subdivisions need not be treated in like manner as the state is found in Section 69 which expressly sets forth limitations on the scope of control which may be exercised by state government and impliedly grants authority to the subdivisions. Section 69 provides that the legislative assembly shall not pass local or special laws laying out, opening, altering or working roads or highways, vacating roads, town plats, streets, alleys or public grounds; locating or changing county seats; regulating county or township affairs; providing for management of common schools; creating offices, or prescribing the powers or duties of officers in political subdivisions; incorporating cities, towns or villages, or changing or amending the charter of any town, city or village; or providing for the election of members of the board of supervisors in townships, incorporated towns or cities.

The authority of the state is further limited in favor of a subdivision by Section 139 which provides that no law shall be passed by the legislative assembly granting the right to construct and operate a street, railroad, telegraph, telephone or electric light plant within any city, town or incorporated village, without requiring the consent of the local authorities having the control of the street or highway proposed to be occupied for such purposes.

Other sections, such as Section 19 dealing with treason, were clearly intended to apply only to the state and not to its subdivisions and thereby serve further to bear out the unequal positions of the several units.

"In enacting § 40–43–07, NDCC, the North Dakota Legislature has demonstrated its awareness of the undesirable features of governmental immunity. We are inclined to agree that it is manifestly unfair that an innocent victim of a tort should be without recourse when the tort is perpetrated by a governmental agency, employee or agent. Although inroads have been piecemeal in that two subsequent amendments have been made to this statute since its origin in 1955, in each instance, these amendments have resulted in diminishing the consequences of this doctrine." Shermoen v. Lindsay, 163 N.W.2d 738 (N.D.1968).

We are unable to conclude that legislative restriction of a judicially initiated doctrine gives that doctrine legislative sanction. Other courts have been equally unimpressed with this contention. See Muskopf v. Corning Hospital District, 55 Cal.2d 211, 11 Cal.Rptr. 89, 359 P.2d 457 (1961); Evans v. Board of County Commissioners, 174 Colo. 97, 482 P.2d 968 (1971); Spanel v. Mounds View School District No. 621, 264 Minn. 279, 118 N.W.2d 795 (1962).[12]

The appellant has made a persuasive argument that there is specific legislative authority for tort actions against the park district and many similar units of local government, authority overlooked in the *Fetzer* case. Section 40–49–04, N.D.C.C., provides that a park district may "sue and be sued." Similar provisions exist for counties,[13] cities,[14] school districts[15] and townships.[16] A number of cases have found such language to be an effective waiver of immunity from tort actions. Petty v. Tennes-

see-Missouri Bridge Commission, 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959); Knowles v. Housing Authority of City of Columbus, 212 Ga. 729, 95 S.E.2d 659 (1956); B. C. Morton Internat'l Corp. v. Federal Deposit Ins. Co., 305 F.2d 692 (1st Cir. 1962). The argument is fortified by the existence of a statutory method for payment of judgments against municipalities. Sections 40–43–01 through 40–43–06, N.D. C.C. While we do not base our decision on this premise, the existence of such statutes provides evidence of a legislative intent not to sanction governmental immunity.

The legislative action taken indicates an intent to restrict rather than sustain this doctrine.[17] The obligation of judicial decision-making is vested in the judicial branch of government. We should not abdicate that responsibility by laying all problems at the door of the legislature.

Interrelated with this question of legislative and judicial function is the role of stare decisis—reliance upon precedent. This is a rule of life, as well as the law. Even the smallest child expects that what has been granted in the case of his older brother will also be granted to him. However, the rule is not inflexible or we should still be literally following decisions of the courts of William the Conqueror. The common law requires the personal evaluation and experience of individual judges. As Chief Justice Erickstad has observed, "If it were the sole purpose of this court to decide today's controversies in light of its earlier decisions, much of our work could be taken over, after proper programming, by a computer, and in this instance our labor would end by apply-

12. "The Minnesota Legislature has not wholly ignored the problem. School districts have been authorized to provide liability insurance and to waive immunity with respect to claims so insured. Such laws are important steps toward mitigating the harshness of the immunity doctrine. However, we do not share the view that a court-made rule, however unjust or outmoded, becomes with age invulnerable to judicial attack and cannot be discarded except by legislative action." Spanel v. Mounds View School District No. 621, 264 Minn. 279, 118 N.W.2d 795, 803.

13. Section 11–10–01, N.D.C.C.

14. Section 40–01–02, N.D.C.C.

15. Section 15–47–43, N.D.C.C.

16. Section 58–03–07(3), N.D.C.C., "To direct the institution or defense of actions * * *"

17. See Sections 40–43–07, 40–42–01, 40–42–02, 40–42–03, 40–49–04, 11–10–01, 15–47–43, 58–03–07(3), 40–01–02, 40–43–01 through 40–43–06, N.D.C.C.

ing the 1910 decision to the facts of this case." Lembke v. Unke, 171 N.W.2d 837, 840 (N.D.1969). The role of stare decisis has been well explained by one of our most distinguished jurists, Justice Cardozo:

"But I am ready to concede that the rule of adherence to precedent, though it ought not to be abandoned, ought to be in some degree relaxed. I think that when a rule, after it has been duly tested by experience, has been found to be inconsistent with the sense of justice or with the social welfare, there should be less hesitation in frank avowal and full abandonment. We have had to do this sometimes in the field of constitutional law. Perhaps we should do so oftener in fields of private law where considerations of social utility are not so aggressive and insistent. There should be greater readiness to abandon an untenable position when the rule to be discarded may not reasonably be supposed to have determined the conduct of the litigants, and particularly when in its origin it was the product of institutions or conditions which have gained a new significance or development with the progress of the years. In such circumstances, the words of Wheeler, J., in Dwy v. Connecticut Co., 89 Conn. 74, 99, express the tone and temper in which problems should be met:

" 'That court best serves the law which recognizes that the rules of law which grew up in a remote generation may, in the fullness of experience, be found to serve another generation badly, and which discards the old rule when it finds that another rule of law represents what should be according to the established and settled judgment of society, and no considerable property rights have become vested in reliance upon the old rule. It is thus great writers upon the common law have discovered the source and method of its growth, and in its growth found its health and life. It is not and it should not be stationary. Change of this character should not be left to the legislature.' If judges have wofully misinterpreted the *mores* of their day, or if the *mores* of their day are no longer those of ours, they ought not to tie, in helpless submission, the hands of their successors." Cardozo, The Nature of the Judicial Process, pp. 150–152 (1921).

See also, Williams v. City of Detroit, 364 Mich. 231, 111 N.W.2d 1, 27 (1961). For additional authority on the question of stare decisis see Abbey v. State, 202 N.W.2d 844 (N.D.1972); Melland v. Johanneson, 160 N.W.2d 107 (N.D.1968).

We do not suggest that this area of governmental liability is one which the legislature cannot modify or shape within its constitutional authority. Indeed, we have considered the application of this decision with that possibility in mind. The matter of sovereign immunity of the state itself, which is untouched by this decision, is one on which we would solicit legislative action. The injustices of state immunity remain for one who is injured by the wrongful act of the state government. In many states where the immunity doctrine has been abolished, some legislative modification or adjustment has been made.[18]

### IV.

■ Having determined the judicial necessity for abolishing the governmental immunity doctrine, we are required to consider the application of this decision to existing and future cases. A change of such far-reaching application requires careful

---

18. "A number of procedural and substantive proposals for the orderly processing of claims have been suggested. Among them are: (1) A requirement for giving prompt notice of the claim after the occurrence of the tort, (2) a reduction in the usual period of limitations, (3) a monetary limit on the amount of liability, (4) the establishment of a special claims court or commission, or provision for trial by the court without a jury, and (5) the continuation of the defense of immunity as to some or all units of government for a limited or indefinite period of time." Spanel v. Mounds View School District No. 621, 264 Minn. 279, 118 N.W.2d 795, 804 (1962).

consideration of the manner in which it is to be applied to minimize confusion and injustice for those relying upon previous decisions of this court.

Consistent with what has been termed the Sunburst Doctrine,[19] state courts have, in recent cases, recognized and utilized prospective application of decisions as a means of avoiding injustice in cases of this type. Decisions have been applied prospectively to be effective as to causes of action arising at varying future dates.[20] The particular rule of law may or may not be applied to the parties to the appeal.[21] This approach provides the judicial branch with some much needed flexibility in dealing with questions having widespread ramifications for persons not parties to the action.

We are persuaded that the rule enunciated in this case should have application to the parties in this action. This removes our decision from the status of obiter dictum and provides appropriate recognition for the effort and expense incurred by the appellants in bringing this appeal. The resolution of issues having broad public interest should be encouraged.

There are two principal objects to be sought by prospective application of this decision. One object is to allow those governmental bodies which have relied upon our previous decisions adequate time to arrange liability insurance coverage for their acts or omissions. The second object is to allow the legislature opportunity to adopt such legislation as it deems advisable to mitigate any hardships arising from this decision. Since the sovereign immunity of the state government is not affected by this decision, legislation to provide a remedy against the state would be an essential subject of consideration.

With these considerations in mind we hold that the abolition of governmental immunity shall be applicable to the parties to this action and to those causes of action arising fifteen days after adjournment of the Forty-fourth Legislative Assembly of the State of North Dakota.

While this case relates to a park district, the abolition of governmental immunity relates to all governmental bodies within the state: counties, townships, park districts, school districts, cities, and any other units of local government or political subdivisions.

■ A further limitation on the scope of this decision should be observed. In certain other jurisdictions abolishing the doctrine, an immunity has been retained for certain acts which go to the essence of governing. See Parish v. Pitts, 244 Ark. 1239, 429 S.W.2d 45 (1968); Spanel v. Mounds View School District No. 621, 264 Minn. 279, 118 N.W.2d 795 (1962). We do not contemplate that the essential acts of governmental decision-making be the subject of judicial second-guessing or harassment by the actual or potential threat of litigation. We hold that no tort action will lie against governmental units for those acts which may be termed discretionary in character. Included within this category are acts traditionally deemed legislative or quasi-legislative, or judicial or quasi-judicial, in nature. The exercise of discretion carries with it the right to be wrong. It is for torts committed in the execution of the activity decided upon that liability attaches, not for the decision itself. In this regard, there is substantial experience in dealing with a discretionary function exception under the Federal Tort Claims Act, which may provide a

**19.** Sunburst Oil & Refining Co. v. Great Northern Ry. Co., 91 Mont. 216, 7 P.2d 927 (1932); Great Northern Ry. Co. v. Sunburst Oil & Refining Co., 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932).

**20.** Smith v. State, 93 Idaho 795, 473 P.2d 937 (1970); Molitor v. Kaneland Community Unit District No. 302, 18 Ill.2d 11, 163

N.E.2d 89 (1959) (and cases cited therein); Holytz v. City of Milwaukee, 17 Wis.2d 26, 115 N.W.2d 618 (1962).

**21.** Compare Holytz v. City of Milwaukee, *supra*, with Williams v. City of Detroit, *supra*.

useful·source of reference.[22] In adopting this exception we do not embrace the "governmental" and "proprietary" functions distinction which Justice Frankfurter termed the "quagmire that has long plagued the law of municipal corporations." Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). We seek a more narrow and a more rational ground for limiting liability.

The judgment is reversed and the case remanded for further proceedings consistent with this opinion.

ERICKSTAD, C. J., and VOGEL, PAULSON and KNUDSON, JJ., concur.

22.   28 U.S.C. § 2680(a). Included among the major cases examining the discretionary function exclusions are Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); Rayonier v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957).