LeRoy C. WALKER, Petitioner
and Appellant,

v.

Lloyd OMDAHL, Director of Accounts
and Purchases, Respondent
and Appellee.

Civ. No. 9187.

Supreme Court of North Dakota.

May 3, 1976.

Rehearing Denied June 21, 1976.

Vance K. Hill, Bismarck, for petitioner and appellant.

William R. Pearce and William P. Pearce, Sp. Asst. Attys. Gen., Bismarck, for respondent and appellee; argued by William R. Pearce.

ERICKSTAD, Chief Justice.

On July 31, 1975, a document entitled Petition for Writ of Prohibition in an action entitled LeRoy C. Walker, Petitioner, vs. Ralph Dewing, Director of Accounts and Purchases, Respondent, was filed with the Clerk of District Court of Burleigh County. The petition was signed by counsel and acknowledged to have been read and believed to be true by Walker.

Pursuant to the petition, the trial court ordered the respondent, Ralph Dewing, to appear before the court on the 13th of August, 1975, to show cause, if any, why a writ of prohibition should not issue. A return was made to the petition by Mr. Dewing through counsel by a document dated the 12th day of August, 1975, and filed with the Clerk of the District Court, Burleigh County, on the 14th of August, 1975, which among other things asserted that the petitioner had not pleaded any damage to himself by the acts of the respondent, nor any other fact legally entitling him to bring the proceeding. Thereafter, counsel for the petitioner, on the 13th day of August, 1975, filed an amended petition for writ of prohibition in which the title was changed to read, State of North Dakota, ex rel. LeRoy C. Walker, Petitioner, vs. Ralph Dewing, Director of Accounts and Purchases, Respondent, and a paragraph was added to include the assertion that the Attorney General had been asked to secure such a writ but that he had declined. When Ralph Dewing resigned to assume another State responsibility, Lloyd Omdahl was appointed as Director of Accounts and Purchases and his name was then substituted as a party. This accounts for the change in the title.

Following the submission of briefs and apparently after oral argument and without the receipt of testimony, the trial court rendered its memorandum decision, upholding Ch. 25, subd. 17, 1975 S.L. against the

contention that it was unconstitutional, in which it concluded that the application for the writ should be denied. An order to that effect was subsequently executed by the trial court on October 24, 1975, and it is from that order that the petitioner appeals to this court.

We use the word "apparently" to explain what transpired in the lower court as the appellant has failed to provide us with a transcript of the proceedings, and accordingly we rely in this instance upon the statement of counsel for the petitioner to that effect.

Because the record that has been transmitted to us does not include from the Attorney General a written refusal to secure the writ, we have no evidence before us disclosing that such a refusal was secured. Since the Attorney General is one of the State officials who would be adversely affected should the petitioner be successful, we shall assume that for that reason and perhaps others, he would have declined, and, accordingly, we shall pursue further the inquiry precipitated by this petition as now captioned and stated.

The pertinent part of the amended petition reads:

"I.

"The respondent, Ralph Dewing, is the director of Accounts and Purchases and in that capacity has made and will continue to make quarterly payments of money to certain state officials in accordance with the provisions of Subdivision 17 of Chapter 25 of the 1975 Session Laws. That law states such payments are for expenses and moneys expended in the discharge of official duties of the officers receiving such payments. The law says such amounts are to be paid quarterly by the department of accounts and purchases without such officers filing any itemized voucher or statement. Other laws authorize such officials to submit itemized vouchers for reimbursement of expenses actually incurred in carrying out their official duties. The officers receiving payments are set forth below with the amount of their annual payment set forth across from their office:

| "Office | Annual unvouchered expense |
|---|---|
| "1. Governor | $22,000.00 |
| 2. Lt. Governor | $ 4,500.00 |
| 3. Secretary of State | $16,000.00 |
| 4. Attorney General | $19,000.00 |
| 5. Superintendent of Public Instruction | $16,000.00 |
| 6. Tax Commissioner | $16,000.00 |
| 7. Insurance Commissioner | $16,000.00 |
| 8. Each Public Service Commissioner | $16,000.00 |
| 9. Commissioner of Agriculture | $16,000.00 |
| 10. State Auditor | $16,000.00 |
| 11. State Treasurer | $16,000.00 |
| 12. Labor Commissioner | $15,000.00 |

"The provisions of Subdivision 17, Chapter 25 of the 1975 Session Laws increase the unvouchered expense payments of those state officials from two to fourteen thousand dollars annually over and above the unvouchered expense payments paid to those officers during 1973 and 1974 as set forth in Chapter 20 of the 1973 Session Laws.

"II.

"That such unvouchered expense payments are in fact salary, which is paid in addition to their official salary, and such payments are being paid in violation of Section 84 of the North Dakota Constitution which provides as follows:

"*Section 84.* Salaries of public officers shall be as prescribed by law, but the salaries of any of the said officers shall not be increased or diminished during the period for which they shall have been elected, and all fees and profits arising from any of the said offices shall be covered into the state treasury.

"III.

"That petitioner is a taxpayer and citizen of North Dakota and is a party beneficially interested in this matter, and has no other plain, speedy and adequate remedy in the ordinary course of law.

"IV.

"The Attorney General was asked to secure such a writ and he declined.

"PETITIONER THEREFORE ASKS that this court issue a temporary Writ of Prohibition to the respondent commanding him to refrain from making further unvouchered expense payments to the officials named above and to show cause before this court why he should not be restrained absolutely from making such payments."

An easy answer to this petition would be that on its face, it discloses no basis for a writ of prohibition.

The long line of decisions of this State involving actions brought by the State on relation of the Attorney General or a private party dating back to early statehood, seem to involve cases in which the petitioner sought to invoke the original jurisdiction rather than the appellate jurisdiction of this court. *See, e. g., State ex rel. Walker v. Link*, 232 N.W.2d 823 (N.D.1975); *State ex rel. Amerada Petroleum Corporation v. North Dakota Public Service Com'n*, 79 N.W.2d 297 (N.D.1956); *State ex rel. Johnson v. Baker*, 74 N.D. 244, 21 N.W.2d 355 (1946); *State ex rel. Lucia v. Monson*, 55 N.D. 892, 215 N.W. 680 (1927); *State ex rel. Shafer v. Lowe*, 54 N.D. 637, 210 N.W. 501 (1926); *State ex rel. McDonald v. Hanley*, 43 N.D. 388, 175 N.W. 569 (1919); *State ex rel. Langer v. Kositzky*, 38 N.D. 616, 166 N.W. 534 (1918); *State ex rel. Linde v. Taylor*, 33 N.D. 76, 156 N.W. 561 (1916); *State ex rel. Linde v. Packard*, 32 N.D. 301, 155 N.W.2d 666 (1915); *State ex rel. Birdzell v. Jorgenson*, 25 N.D. 539, 142 N.W. 450 (1913); *State v. Nelson County*, 1 N.D. 88, 45 N.W. 33 (1890). *But see State ex rel. Hughes v. Milhollan*, 50 N.D. 184, 195 N.W. 292 (1923).

Whether initiating the proceeding in trial court as opposed to initiating it in this court lessens the requirements of standing we shall not attempt to determine today. That is an issue we shall reserve for another occasion when it is specifically briefed and argued by counsel.

The other decisions which the respondent in this action refers to us for our consideration relate to the standing of the petitioner in actions brought by private parties and not by the State. *See, e. g., Fristad v. Sherman*, 76 N.W.2d 903 (N.D.1956); *Asbury Hospital v. Cass County*, 72 N.D. 359, 7 N.W.2d 438 (1943); *King v. Baker*, 69 N.D. 581, 288 N.W. 565 (1939); *Anderson v. Byrne*, 62 N.D. 218, 242 N.W. 687 (1932); *McLane v. Scofield*, 49 N.D. 384, 191 N.W. 842 (1922); and *Olson v. Ross*, 39 N.D. 372, 167 N.W. 385 (1918).

■ In any event, in light of the decision of *State ex rel. Walker v. Link*, 232 N.W.2d 823 (N.D.1975), in which three of the justices of this court did not participate having deemed themselves disqualified, it would appear that petitioner Walker has an interest which would permit him under § 32–35–02, N.D.C.C., as a person "beneficially interested", to file the petition in the instant case.

Having so concluded we shall attempt now to determine the merits of this appeal.

■ The petitioner's basic contention is that subdivision 17 of Chapter 25 of the 1975 Session Laws, which provides for quarterly payments of unvouchered expenses to certain elected State officials of the executive branch of government, is unconstitutional as a violation of Section 84 of the North Dakota Constitution. He asserts that payments for unvouchered expenses constitute salary and, accordingly, that to the extent that the unvouchered expense allowances were increased during the term for which the State officials were elected, the increases constitute a violation of Section 84. We take judicial notice that State officials may be reimbursed for mileage and travel expenses. *See* Section 54–06–09, N.D.C.C., and Chapter 44–08, N.D.C.C.

When Section 84 was amended in 1960 to read as it now reads, all State officials with the exception of the public service commissioners were elected to hold office for two years; whereas now, except for the public service commissioners who are elected to staggered terms of six years, they are elected to hold office for four years.

Again, an easy answer appearing on the surface is that anything which increases the

benefits a public official receives during his term in office violates Section 84.

We know, however, that this cannot be the rule; for, since early statehood and possibly from territorial times, the Governor has received additional benefits including a furnished home, maintenance of the home, and other domestic services, all of which, except during the Depression, have likely increased in cost during the term for which the Governor was elected. For specific line item expenditures relating to the executive mansion, see, e. g., S.L.1919, Ch. 29 ($2,700 for improvements at the executive mansion); S.L.1939, Ch. 23, subd. 16b ($2,500 for governor's residence); S.L.1941, Ch. 29, subd. 16b (same); S.L.1955, Ch. 66 ($200,000 to construct the existing residence). It appears that normal maintenance costs and operating expenses have been covered in the appropriations for the Director of Institutions (formerly, the Board of Administration); see, in this regard, e. g., S.L.1929, Ch. 6; S.L.1953, Ch. 20; S.L.1957, Ch. 1; S.L.1975, Ch. 31. The Legislature has also appropriated money for automobiles for the Governor; see, e. g., S.L.1959, Ch. 1, subd. 17.

The mere fact that the funds for such services or benefits may have come from some budget other than the Governor's such as the budget of the Director of Institutions in recent years, or the Board of Administration in previous years, is immaterial.

In State *ex rel. Lyons v. Guy*, 107 N.W.2d 211 (N.D.1961), the petitioner therein sought leave to file an information in the nature of quo warranto in this court seeking the disqualification of Governor William L. Guy.

One of his contentions was that in being a member of the legislative assembly in 1959 which appropriated the sum of $4,500 for the purchase of a car for the use of the Governor of the State of North Dakota, Mr. Guy became ineligible to serve as Governor under the provisions of Section 39 of the North Dakota Constitution.

Section 39 reads:

"Section 39. No member of the legislative assembly shall, during the term for which he was elected, be appointed or elected to any civil office in this state, which shall have been created, or the emoluments of which shall have been increased, during the term for which he was elected; nor shall any member receive any civil appointment from the governor, or governor and senate, during the term for which he shall have been elected."

In responding to the petitioner's contention, Justice Morris, speaking for the entire court, said:

"The appropriation under discussion provided for the purchase of an automobile by the Board of Administration for the use of the Governor. It was the property of the State. When he used it he was not entitled to mileage. The restrictions of Section 39–01–03 NDCC applied to its use to the same extent as to the use of any other motor vehicle owned by the State. The purchase of the automobile merely changed the mode of transportation available to the Governor. It did not increase the emoluments of his office." *State ex rel. Lyons v. Guy, supra*, 107 N.W.2d at 216.

Notwithstanding the court's conclusion, we suspect that the availability of a car at State expense, was more beneficial to the Governor than the mileage allowance permitted upon the filing of appropriate vouchers.

This would seem to indicate that not all benefits are emoluments within the meaning of Section 39, nor are they salaries within the meaning of Section 84 of the State Constitution.

The petitioner seems to concede that not all benefits received by State officials as a result of their office are salaries within the meaning of Section 84. Our impression of the petitioner's view relative thereto is derived from the following quotation from the petitioner's brief:

"Whether a lump-sum allowance by the legislature purporting to be for official expenses can be sustained as an allowance for expenses and not a prohibited increase of compensation depends upon

whether the amount allowed is within such reasonable limits as to authorize the conclusion that it might be covered by an itemized statement of such official expenses. 5 A.L.R.2d 1182, 1223. There appears to be no decisions by the North Dakota Supreme Court on this issue. *State v. Baker* [74 N.D. 244], 21 N.W.2d 355 [(1945)]; *State v. Guy*, 107 N.W.2d 211 [(N.D.1961)]; and *Verry v. Trenbeath*, 148 N.W.2d 567 [(N.D.1967)], dealt with related questions but are not precedent in law or fact for the issues raised by the petitioner. In addition to the general rule stated above, it has been said that the courts will not disturb a determination by the legislature unless the amount allowed was so plainly in excess of any expenses which could possibly be incurred by the officers in the discharge of their official duty that it was obvious that a salary increase was intended. *Tierney v. Van Arsdale*, 332 S.W.2d 546, 547 [(Ky. 1960)], and *State v. Reeves* [44 S.D. 568], 184 N.W. 993 [(1921)]. * * *"

In *Verry v. Trenbeath*, 148 N.W.2d 567 (N.D.1967), one of the decisions referred to by the petitioner, this court, in an opinion written by Chief Justice Teigen, upheld the validity of Chapter 340 of the Session Laws of 1965 in face of the contention that a part thereof violated Section 45 of the State Constitution.

Section 45 reads:

"Each member of the legislative assembly shall receive as a compensation for his services for each session, five dollars per day, and ten cents for every mile of necessary travel in going to and returning from the place of the meeting of the legislative assembly, on the most usual route."

The pertinent part of the statute under attack in *Trenbeath* read:

"§1. *Amendment*.) Section 54–03–20 of the North Dakota Century Code is hereby amended and reenacted to read as follows:

"54–03–20. *Allowance for Living Expenses of Members of Legislative Assembly*.) Each member of the legislative assembly of the state of North Dakota shall be entitled to, and shall receive the sum of twelve hundred dollars as reimbursement for his living expenses, including meals, lodging and uncompensated travel, and other necessary expense during the legislative session and thirty-five dollars for each month of the biennium for which he was elected for uncompensated expenses incurred in the execution of his public duties during the biennium and while the legislative assembly is not in session, which total sum of two thousand forty dollars * * *." S.L.1965, Ch. 340.

A comparison of the allowances for unvouchered expenses in the sum of two thousand forty dollars with the salary of three hundred dollars, discloses that the unvouchered expenses were almost seven times the salary. The interim expenses which were the subject of the attack were eight hundred forty dollars per member or almost three times the salary of each member. Notwithstanding that fact, this court found that the interim expenses were not plainly and palpably in excess of expenses which could possibly be incurred by legislators in the exercise of their public duties during the interim. *Verry v. Trenbeath*, 148 N.W.2d 567 at 574 (N.D.1967).

In his brief, the petitioner further asserts:

"Unvouchered expense payments now are a means of hiding the actual salary of state officers and allowing legislators to be 'apparently' eligible to seek such offices because the 'salary' was not increased."

If he is correct in this assertion, his pursuit of a writ prohibiting the payments to the State officials will not prohibit the legislators from seeking the offices of the State officials, as the expense payments under Chapter 25, subdivision 17 of the 1975 Session Laws are effective only during the calendar years of 1975 and 1976 and terminate prior to the next terms of State offices. Accordingly, even if the payments were held to be an increase in the "emoluments" of State officials, they would not be an increase from which the legislators seek-

ing election to State offices could benefit and thus those payments would not be a disqualification under Section 39 of our State Constitution. If the petitioner were to prevail in his efforts, the result would be that those who have no control over the manner in which they are compensated would be the ones who would suffer, not the ones who determined the manner of compensation. We do not believe that the people who approved Section 84 of the State Constitution either in 1889, or when it was amended in 1960, intended such a result.

Counsel for the petitioner during oral argument conceded that when the unvouchered expense allowances are added to the officials' salaries, the total remuneration is not excessive. He stressed that it was the manner of the distribution of funds to State officials that was objectionable, not the amounts.

Proof that the total of the salary and unvouchered expense allowances does not constitute a total which could be considered excessive may be seen from an analysis of a chart contained in the 1974–75 edition of The Book of the States, pages 150 through 154, showing the annual salaries as of late 1973 for state administrative officials and a chart contained in the 1976–77 edition of said book (to be published as pages 116 through 120) showing the annual salaries as of late 1975.

The chart indicates that except for the State of Arkansas, the salaries paid to State officials of the State of North Dakota are the lowest by thousands of dollars when the allowances for expenses are not included. When they are included for the comparable period the totals do not appear to be excessive. We include that part which relates to the Governor's salary from the charts:

In defense of the legality of the unvouchered expense allowance, counsel for Omdahl point out that there has been a long history in North Dakota of payment of unvouchered expenses to judges, legislators, and State officials. Lest confusion arise from this statement, we point out that at the present time judges do not receive any unvouchered expense payments.

| "State or other jurisdiction | Governor [late 1973] | Governor [late 1975] |
| --- | --- | --- |
| Alabama | $25,000 | $28,955 |
| Alaska | 40,000 | 50,000 |
| Arizona | $35,000 | $40,000 |
| Arkansas | 10,000 | 10,000 [1] |
| California | 49,100 | 49,100 |
| Colorado | 40,000 | 40,000 |
| Connecticut | 35,000 | 42,000 |
| Delaware | 35,000 | 35,000 |
| Florida | 40,000 | 50,000 |
| Georgia | 50,000 | 50,000 |
| Hawaii | 42,000 | 46,000 |
| Idaho | 30,000 | 33,000 |
| Illinois | 50,000 | 50,000 |
| Indiana | 36,000 | 37,000 |
| Iowa | 40,000 | 40,000 |
| Kansas | 20,000 | 35,000 |
| Kentucky | 35,000 | 35,000 |
| Louisiana | 28,374 | 50,000 |
| Maine | 35,000 | 35,000 |
| Maryland | 25,000 | 25,000 |
| Massachusetts | 40,000 | 40,000 |
| Michigan | 45,000 | 45,000 |
| Minnesota | 41,000 | 41,000 |
| Mississippi | 35,000 | 43,000 |
| Missouri | 37,500 | 37,500 |
| Montana | 25,000 | 30,000 |
| Nebraska | 25,000 | 25,000 |
| Nevada | 30,000 | 40,000 |
| New Hampshire | 32,760 | 34,070 |
| New Jersey | 50,000 | 60,000 |
| New Mexico | 26,000 | 35,000 |
| New York | 85,000 | 85,000 |
| North Carolina | 35,000 | 38,500 |
| North Dakota | 18,000 | 18,000 |
| Ohio | 50,000 | 50,000 |
| Oklahoma | 35,000 | 42,500 |
| Oregon | 35,000 | 38,500 |
| Pennsylvania | 60,000 | 60,000 |
| Rhode Island | 42,500 | 42,500 |
| South Carolina | 35,000 | 39,000 |
| South Dakota | 25,000 | 27,500 |
| Tennessee | 50,000 | 50,000 |
| Texas | 63,000 | 65,000 |
| Utah | 33,000 | 35,000 |
| Vermont | 35,000 | 36,100 |
| Virginia | 35,000 | 50,000 |
| Washington | 34,300 | 42,150 |
| West Virginia | 35,000 | 35,000 |
| Wisconsin | 25,000 | 44,292 |
| Wyoming | 37,500 | 37,500" |

The Council of State Governments, The Book of the States, 1974–75, Vol. XX, p. 150; 1976–77, Vol. XXI, p. 116.

1. While the Arkansas Constitution establishes the Governor's salary at $10,000 per year, the Legislature there has provided two other benefits: A public relations fund payable monthly of $1,119.87 and a mansion allowance for the sustenance of the executive's family and guests payable monthly of $2,200. See 1975 Arkansas Acts 64, 248, and 1120.

Because we believe that the history of the payment of expenses to elected State officials other than judges is significant, we shall hereafter quote from a part of the brief filed by Omdahl disclosing the history relative to the payment of unvouchered expenses to such officials.

" * * * As early as 1907 North Dakota provided for unvouchered expense payments by Chapter 30, S.L. 1907. * * * The 1907 Act provided for the payment of $500.00 to a number of the state elected officers as well as several appointed ones for the years 1907 and 1908. In 1909 the legislature passed Chapter 216, S.L. 1909, * * * This Act applied to the governor and a number of other elected state officers then in office. Section 1 of the Act specifically provided $1,500.00 per year for the personal expenses of the governor and Section 2 provided $750.00 per year for the personal expenses of the other named officers, and $400.00 per year for the members of the board of railroad commissioners. Section 4 of the Act set the salaries of these same officers. There was an emergency clause attached to the Act, pointing out that an emergency existed 'in that there is no provision of law providing for the payment of the necessary personal expenses of the state officers herein mentioned.'

"No further provisions for expenses for state officers appear until 1951. During part of that intervening time there was such a long economic depression that salaries of every kind, public and private, went down and, of course, living expenses also went down. Beginning in 1951 the legislature realized that it would be necessary to make an allowance for expenses for the proper administration of government by capable people and therefore beginning with Chapter 57, S.L. 1951 * * * the legislature provided for an unvouchered payment of a lump sum expense allowance to the secretary of state, state auditor, state treasurer, commissioner of insurance, public service commissioners and commissioner of agriculture and labor. In 1957 the legislature, for the same purpose, provided for a lump

sum expense payment to the elected public officers of North Dakota, pursuant to Chapter 2, S.L. 1957 * * * Each biennial session of the legislature since that time has enacted a similar measure. * * *"

An analysis of this history discloses that the Legislature has since the 1957 session, regularly in each session thereafter, gradually increased the amount appropriated for unvouchered expenses for State officials, except for the 1969 session when the appropriations for that purpose were apparently reduced because of an increase in the salary which was passed by the 1965 session of the Legislature and became effective on January 1, 1969. See Section 12 of Chapter 344 of the 1965 Session Laws. We say the legislators gradually increased the allowances and that is true except for the allowances provided for in subdivision 17 of Chapter 25 of the 1975 Session Laws.

There are certain rules of construction which apply in every case in which a statute is contended to violate a constitutional provision.

"1. A law enacted by the Legislature is presumed to be constitutional, unless it is shown that it is manifestly violative of the organic law.

"2. The courts will construe statutes so as to harmonize their provisions with the Constitution if it is possible to do so, to the end that they may be sustained.

"3. Every presumption is in favor of the propriety and constitutionality of legislation, and improper motives in its enactment are never imputed to the Legislature." *State v. Miller,* 129 N.W.2d at 356–357 (N.D.1964).

In addition to these rules we must consider that in this case the court is being asked to substitute its judgment for that of the Legislature in a matter which calls for legislative discretion. In such matters we are normally reluctant to intervene unless the legislative act clearly contravenes the Constitution and its objectives. Stability, continuity, and the ability to perform are essential to the survival of any government.

The Legislature, being the political arm of our government, is the body given the power within constitutional limits to preserve such elements for the life of the State. The Legislature enacts the laws by which we live, but under our Constitution the administration of the laws is left to the executive branch of government. It is apparent that laws can only be as effective as they are administered. Hence it follows that the Legislature has a vital interest in making the State offices attractive to the most qualified and dedicated people. In the last quarter of a century the Legislature has used the unvouchered expense account as an incentive to attract such people to public office.

We think the successive legislative assemblies from 1951 to 1975 were entitled to take cognizance of the tremendous inflation which has taken place in this country and which has greatly reduced the purchasing power of the dollar and accordingly increased the expenses of everyone, and especially those who must minister to the needs of the people of our State and do so in a manner which will not reflect adversely upon the people of our State.

■ We believe that the Legislature may provide for inflationary increases in the cost of living for State officials as official expenses without violating Section 185 of the State Constitution, and that such expenses may be increased during the term for which officials were elected without violating Section 84 of the State Constitution.

The Supreme Court of Washington recognized that changed conditions may require such a view in *State ex rel. Todd v. Yelle,* 7 Wash.2d 443, 110 P.2d 162 (1941). In that case the court was considering a constitutional limitation on legislative salaries. We quote:

"Constitutional provisions are static, and properly and intentionally so, but the purchasing price of a dollar is not. No doubt, when the constitution of Oregon was adopted in 1859, a legislator could reasonably maintain himself, when absent from his usual place of residence, upon three dollars per day plus three dollars for each twenty miles of travel, and, doubtless, a legislator could reasonably maintain himself at Olympia upon five dollars per day and mileage at ten cents per mile when our own constitution was adopted thirty years later. But it is no longer possible to conveniently do so, and has not been for a number of years. * * * " *State v. Yelle, supra,* 110 P.2d at 165.

It is also pertinent to note this observation:

" * * * the court in *Manning v. Sims* (1948) 308 Ky. 587, 213 S.W.2d 577, 5 A.L.R.2d 1154, stated that frequently, in recognition of changing economic conditions, the legislature deems it sensible to allow, increase, or diminish expense allowances incident to the performance of the duties of an office, and that while such statutes may increase or diminish the 'take home' pay—the gross receipts— of the officer or employee, the Constitution deals with the salary or compensation, which is not changed by the increase or decrease in such expenses." 5 A.L. R.2d 1189.

The consumer price index rose from 100 points in 1967 to 166.3 points at the end of 1975, CPI Detailed Report for December 1975, p. 1, Library of Congress Catalog number 74–647019, and from 123.1 points in 1971 to 138.5 points in 1973, Consumer Price Indexes for December 1971, p. 1, and for December 1973, p. 1.

■ In light of our conclusion that the Legislature may provide for cost of living increases through unvouchered expense allowances, the issue becomes that of the reasonableness of the legislative action in Chapter 25, subd. 17 of the 1975 Session Laws.

The following chart discloses the increases in expense allowances from 1973 to 1975:

| Office | 1973 | 1975 | Increase |
|---|---|---|---|
| Governor | $8,000 | $22,000 | $14,000 |
| Lt. Governor | 2,500 | 4,500 | 2,000 |
| Attorney General | 9,500 | 19,000 | 9,500 |
| Secretary of State | 9,000 | 16,000 | 7,000 |
| Supt. of Public Instruction | 8,000 | 16,000 | 8,000 |
| Tax Commissioner | 8,000 | 16,000 | 8,000 |
| Com. of Insurance | 9,000 | 16,000 | 7,000 |
| Each Public Serv. Commissioner | 9,000 | 16,000 | 7,000 |
| Com. of Agric. | 9,000 | 16,000 | 7,000 |
| State Auditor | 9,000 | 16,000 | 7,000 |
| State Treas. | 9,000 | 16,000 | 7,000 |
| Com. of Labor | 8,000 | 15,000 | 7,000 |

*Compare* S.L. 1973, Ch. 20, *with* S.L. 1975, Ch. 25, subd. 17.

The amount of the increase as well as the percent of increase, when compared with the allowances and percent of increase in preceding legislative sessions, make them suspect and militates against their being considered as a catch-up on the cost of living. They would have been justified as salary in light of salaries paid to persons holding comparable positions in other states, but as salary they are prohibited by Section 84 of our State Constitution which prohibits an increase in salary during the term for which our State officials are elected.

In addition to the comparison of changes in the unvouchered expense allowances from session to session, which indicates that the increase from 1973 to 1975 is unreasonable, we note S.L. 1975, Ch. 16, which appropriated money for payment of additional compensation to State employees during the period beginning January 1, 1975 and ending June 30, 1975. The average monthly salary increase for that period for all State employees, as a result of the appropriation, was 11.9% above the salaries which had been authorized by the 1973 Legislature.

We do not, by mentioning the 11.9% increase for State employees during the last quarter of the 1973–1975 biennium, mean to imply that a similar figure is controlling for State officials. We note, incidentally, that the consumer price index increased 22% between the beginning of 1973 and of 1975, a factor of which we assume the Legislature was cognizant. *Compare* Consumer Price Index for December 1972, p. 1, *with* Consumer Price Index for December 1974, p. 1.

Nor do we mean by our discussion of these factors to limit the Legislature to these factors, but since nothing specifically has been referred to us justifying these increases from the standpoint of expenses and we can conceive of none in these amounts, we must conclude that expenses beyond the allowances for expenses in the previous session of the Legislature which exceed amounts reasonably necessary to cover increases in the cost of living are salary, and thus violative of Section 84 of the Constitution.

■ Notwithstanding that we have so concluded, we hold that this opinion shall be applied prospectively as of the end of the term to which each incumbent State official was elected.

We have recent precedent in two decisions of our court for using the prospective overruling approach. In *Johnson v. Hassett,* 217 N.W.2d 771 at 780 (N.D.1974), we held the guest statute unconstitutional and applied the decision to the case and to all claims for relief accruing on and after the date of the original decision. In *Kitto v. Minot Park District,* 224 N.W.2d 795 at 804 (N.D.1974), in which we abolished the doctrine of governmental immunity as distinguished from sovereign immunity, we applied the decision to the case and then prospectively to causes of action arising 15 days after adjournment of the next legislative assembly.

In the instant case because of the reliance on the part of the State officials upon the statute which we have now held to be unconstitutional as it respects an amount in excess of that which might be reasonably considered an allowance for the increase in the cost of living, we decline to apply the decision to the instant case and instead apply it wholly prospectively. The doctrine which we apply today is a modification of the "Sunburst Doctrine" named after an opinion by Justice Cardozo in *Great Northern Ry. Co. v. Sunburst Oil and Refining Co.,* 287 U.S. 353, 53 S.Ct. 145, 77 L.Ed. 360, 85 A.L.R. 254 (1932). *See* 60 Harv.L.Rev. 437 (1947); 71 Yale L.J. 907 (1962); and

Dickerson, *The Interpretation and Application of Statutes,* at 252–261 (1975).

Although we have applied the doctrine more prospectively than contemplated in footnote 11 of the above Harvard Law Review note, we believe that in light of all that we have said earlier in this opinion justifying the total amount of remuneration, and the reliance which the State officials have placed upon Chapter 25, subd. 17 and previous statutes providing for expense allowances, that the circumstances in this case warrant our adaptation of the Sunburst Doctrine.

For cases holding, either with or without reference to the Sunburst Doctrine, that officers who act in good faith in reliance on a statute before it is declared unconstitutional will be protected, *see e. g., Wichita County v. Robinson,* 155 Tex. 1, 276 S.W.2d 509 (1954); *Allen v. Holbrook,* 103 Utah 319, 135 P.2d 242 (1943); *Golden v. Thompson,* 194 Miss. 241, 11 So.2d 906 (1943); and *Shreve v. Western Coach Corporation,* 112 Ariz. 215, 540 P.2d 687 (1975).

If we may be permitted to offer advice to the Legislature for future consideration, we suggest that salaries of State officials be set at the beginning of each term with an eye to the future so that it is unnecessary thereafter to provide for unvouchered expenses, as unvouchered expenses in the future beyond those which could be considered reasonably necessary to cover cost of living increases will be illegal. Further, in the future they will be recoverable, for there will then be no basis for reliance on the statute. Hopefully, the problems we have confronted in this case will be considered fully by the Legislature when it next meets, and from careful study a solution will be found which will shore up the executive branch rather than undermine it.

Possible constitutional amendment in light of changed conditions and times should not be overlooked.

The writ of prohibition is denied and the order denying the writ of prohibition is affirmed for reasons stated herein.

VOGEL and PAULSON, JJ., and DOUGLAS B. HEEN, District Judge, concur.

SAND, J., deeming himself disqualified did not participate; DOUGLAS B. HEEN, Judge of the Second Judicial District, sitting in his place.

PEDERSON, Judge (concurring specially).

I concur in the result reached by the majority that Chapter 25, subdivision 17, 1975 Session Laws, violates Section 84 of the North Dakota Constitution. I also concur in the determination that the opinion shall have prospective application only, and with the statements of the necessity therefor.

Although legislative enactments are entitled to a presumption of regularity, this decision should stand for the proposition that the judiciary will not avoid its duty to prevent evasion of the Constitution by sham. Accordingly, I find it necessary to decline to concur with paragraph 5 of the syllabus, and its supporting statements, because it appears to leave the door open to language manipulation to evade a constitutional prohibition.