**Gilbert COPPER and Adele Norberg, Plaintiffs,**

v.

**CITY OF FARGO, Sherri Arnold, and Kevin Niemann, Defendants.**

Civ. No. A3–93–130.

United States District Court, D. North Dakota, Southeastern Division.

Dec. 30, 1994.

---

See also, 905 F.Supp. 703.

Thomas W. Condit, Condit & Dressing Co., LPA, Cincinnati, OH, Peter B. Crary, Fargo, ND, for plaintiffs.

Mike Miller, Solberg, Stewart, Miller, Johnson & Noack, Fargo, ND, for defendants.

## MEMORANDUM AND ORDER

KLEIN, United States Magistrate Judge.

On August 18, 1993, plaintiffs Gilbert Copper and Adele Norberg filed this civil action against defendants Officer Sherri Arnold, Officer Kevin Niemann and the City of Fargo seeking redress for alleged violations arising out of the unconstitutional enforcement of Fargo Municipal Code § 10–0802. Plaintiffs' complaint sets forth four causes of action based on federal constitutional and state law theories. Pending before the court are defendants' motion for summary judgment, defendants' request for an oral hearing on their motion for summary judgment, plaintiffs' motion for partial summary judgment, plaintiffs' motion for oral argument on the pending motions, and plaintiffs' motion for leave to file a reply to defendants' motion for summary judgment.

## I. BACKGROUND

Prior to August 20, 1991, the City of Fargo enacted a residential picketing ordinance which provided as follows:

10–0801. Definitions.—For purposes of this article, certain words and phrases used herein are defined as follows:

1. "Dwelling" means any structure or building, or dwelling unit within a building, which is used as a place of residence.

2. "Picketing" means the practice of standing, marching, or patrolling by one or more persons inside of, in front, or about any premises for the purpose of persuading an occupant of such premises or to protest some action, attitude or belief....

10–0802. Picketing of dwellings prohibited.—No person shall engage in picketing the dwelling of any individual in the City of Fargo....

Fargo Municipal Code § 10–0801 and § 10–0802 (1985) (amended Feb. 1, 1993). This ordinance is similar to an ordinance enacted in Brookfield, Wisconsin. The Brookfield ordinance, which was upheld by the United States Supreme Court in *Frisby v. Schultz*, contains a flat ban on targeted residential picketing, providing: "It is unlawful for any person to engage in picketing before or about the residence or dwelling of any individual in the Town of Brookfield." *Frisby v. Schultz*, 487 U.S. 474, 477, 108 S.Ct. 2495, 2498, 101 L.Ed.2d 420 (1988).

On August 20, 1991, plaintiffs participated in a public pro-life demonstration in the residential neighborhood of Lynn Gifford, spokesperson for the Women's Health Organization.[1] Copper, Norberg, and four other individuals walked back and forth on public sidewalks and streets carrying signs or enlarged photographs of fetuses. Plaintiffs contend that Copper's picketing route "started at the corner of Fourth Street and Seventh Avenue South, and then proceeded on an 'L-shaped' route east on Seventh Avenue South and north on Third Street North, then back on the opposite sides of those two streets, covering an area estimated by Copper to be ¼ mile in length." (Pls.' Statement of Material Facts at 2). Norberg's picketing route was allegedly limited to walking east and west on Seventh Avenue South between Third Street South and Fourth Street South or north and south on Third Street South between Sixth Avenue South and Seventh Avenue South. (*Id.* at 3; Defs.' Statement of Material Facts at 2). Plaintiffs assert that they did not block or impede any person's access to or from private property and that they remained silent during their picketing activities except when approached by others. (Pls.' Statement of Material Facts at 2). Plaintiffs also allege that they made no more than momentary stops in front of any particular residence until their encounter with Marty Stutlien. (Pls.Compl. at 4).

While plaintiffs were demonstrating, Marty Stutlien, who lives at 725 Third Street South in the same apartment complex as Lynn Gifford, interrupted the picketing. Stutlien told the picketers to leave, yelled at them, tore up some of their placards and allegedly assaulted a juvenile picketer and ripped his shirt. (Defs.' Statement of Material Facts at 2; Copper Depo. at 89–96). Stutlien also allegedly sprayed water on the picketers from a water hose. (*Id.*).

Shortly after the confrontation between Stutlien and the picketers, Fargo Police Offi-

---

1. Lynn Gifford's address is 325 Seventh Avenue South, Fargo, North Dakota.

cers Kevin Niemann and Sherri Arnold arrived on the scene.[2] They had been dispatched to Gifford's address with a report that a fight had occurred. (Depo. of Kevin Niemann, dated Apr. 19 & 20, 1994, at 9–10). As he was pulling up to the curb, Niemann observed about five people carrying pro-life signs standing on the sidewalk near Gifford's residence.[3] (*Id.* at 10–11). After Niemann observed the picketers for no more than ten seconds, they "scurried" northbound on Third Street. (*Id.* at 11–12, 17). Niemann called them back and questioned them about the reported incident. (*Id.* at 12–13).[4]

Niemann testified that the picketers wanted him to arrest Stutlien for assaulting a juvenile. (*Id.* at 13). He allegedly explained that if the juvenile wanted to press charges against Stutlien, the juvenile must provide certain information, such as his full name, address, etc. (*Id.*) The juvenile refused to provide any information except to state that his name was "Gabriel." (*Id.* at 13–14). Niemann claims that the picketers eventually agreed not to press charges against Stutlien and to go home. (*Id.* at 14; Pls.' Mot. for Partial Summ.J., app. at 23). However, just as the picketers were about to disburse, Leo Castellano arrived and insisted that "Gabriel" pursue a criminal assault claim against Stutlien. (Depo. of Kevin Niemann, dated Apr. 19 & 20, 1994, at 14–16; Pls.' Mot. for

Partial Summ.J., app. at 23). Niemann testified that he explained to Castellano why he could not arrest Stutlien, but Castellano insisted that Niemann arrest Stutlien immediately or the picketers would not leave the area. (Depo. of Kevin Niemann, dated Apr. 19 & 20, 1994, at 16). Niemann allegedly asked the picketers to leave, but they refused.

Copper testified that he informed Niemann of his belief that according to a United States Supreme Court decision, he and the other demonstrators could legally picket in a residential area if they walked a certain distance, spaced themselves a certain distance apart and continually moved silently past a certain number of dwellings. (Depo. of Gilbert Copper, dated Apr. 20 & 21, 1994, at 101; Copper Aff. at 2). Copper also testified that he described the demonstrators' picketing route to Niemann and explained that the demonstrators were not illegally picketing.[5] Niemann allegedly disagreed with Copper about the legality of plaintiffs' demonstration and informed Copper that the picketers would be arrested if they did not leave the neighborhood. (Copper Aff. at 2). "After considering his options, Copper decided to continue picketing." (Pls. Statement of Material Facts at 4).

2. Niemann and Arnold arrived at the scene in separate cars at approximately the same time. (Depo. of Kevin Niemann, dated Apr. 19 & 20, 1994, at 10). Niemann arrived shortly before Arnold. (Test. of Sherri Arnold, 12/1/94).

3. Defendants contend that Niemann and Arnold neither witnessed the confrontation nor observed the picketers walking any specific route. (Defs.' Statement of Material Facts at 2, para. 6)

4. Copper testified that Officers Niemann and Arnold did not question him or anyone else about the assault on the juvenile. Copper told the officers about the incident. In response to Copper's statements, Niemann allegedly stated, "This is not the issue. Illegal picketing is the issue." (Depo. of Gilbert Copper, Apr. 20 & 21, 1994, at 100–101).

5. The evidence submitted by plaintiffs in response to defendants' summary judgment motion and in support of their motion for partial summary judgment did not clarify whether Copper or any other picketer informed the officers that their picketing route was at least one block long

and that several picketers marched in a two-block L-shaped pattern. Therefore, the court held a hearing on December 1, 1994, to fill this information gap. During the hearing, Copper testified that he began to explain the distance of the demonstrators' picketing route to Niemann, but Niemann turned away from him before he finished his description. (Test. of Gilbert Copper, 12/1/94). Norberg testified that she did not discuss the picketing routes with the police officers. (Test. of Adele Norberg, 12/1/94).

Officer Arnold's police report notes that Christiane Kalk informed her about routes the picketers used; however, Arnold testified that she did not learn this information until she interviewed the picketers at the police station after the arrests were made. (Pls.' Mot. for Summ.J., app. at 22; Test. of Sherri Arnold, 12/1/94).

Niemann testified that the picketers did not, at any time, tell him what route they were picketing. In addition, Niemann claimed that he was not aware of the picketing route before he arrested plaintiffs. (Depo. of Kevin Niemann, dated Apr. 19 & 20, 1994, at 16, 30–31, 48–50; Test. of Kevin Niemann, 12/1/94).

Niemann arrested the picketers, including plaintiffs, for picketing a private residence. Copper and Norberg contend that defendant Arnold acted in concert with and as a back-up to Officer Niemann when he arrested the picketers. (Copper Aff. at 2; Norberg Aff. at 5). The City of Fargo filed charges in Cass County District Court against plaintiffs for violating Fargo Municipal Code § 10–0802. On February 18, 1992, the Honorable Frank L. Racek dismissed the charges against plaintiffs, ruling that the picketing ordinance was constitutional on its face, but unconstitutional as applied to Copper, Norberg, and the other picketers who demonstrated near the Gifford residence on August 20, 1991. Plaintiffs then filed this action seeking redress for the allegedly unconstitutional enforcement of Fargo's residential picketing ordinance.

## II. PLAINTIFFS' MOTION FOR LEAVE TO FILE AN ANSWER BRIEF

On August 15, 1994, plaintiffs filed a motion for leave to file an answer brief in response to defendants' motion for summary judgment. Since defendants did not resist this motion and since the court may find plaintiffs' brief helpful, the court will grant plaintiffs' request.

## III. SUMMARY JUDGMENT MOTIONS

### A. SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.Pro. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "A dispute is genuine when 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Westchem Agr. Chemicals, Inc. v. Ford Motor Co.*, 990 F.2d 426, 429 (8th Cir.1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment ... against a party failing to make a showing sufficient to establish the existence of an element essential to that party's case."

*Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. The court considering a motion for summary judgment must view the evidence in the light most favorable to the nonmoving party who enjoys "the benefit of all reasonable inferences to be drawn from the facts." *Vacca v. Viacom Broadcasting of Missouri, Inc. et al.*, 875 F.2d 1337, 1339 (8th Cir.1989) (citation omitted). Summary judgment is improper if the court finds a genuine issue of material fact; however, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment...." *Commercial Union Insurance Co. v. Schmidt*, 967 F.2d 270, 271–72 (8th Cir.1992) (citation omitted). The issue is whether the evidence submitted presents a sufficient disagreement about the material facts so that submission to a jury is required, or whether the evidence is so one-sided that a party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986).

### B. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

On July 15, 1994, plaintiffs filed a motion for partial summary judgment requesting this court to decide all questions of law relating to the constitutionality of Fargo Municipal Code § 10–0802 as written and as applied. Specifically, plaintiffs urge this court to find that defendants violated plaintiffs' federal constitutional rights and to find that defendants' acts were performed pursuant to the official policies and customs of the City of Fargo, thereby giving rise to liability for damages. (Pls.' Compl. at 6). Accordingly, plaintiffs request that this court enter judgment in their favor on the first cause of action set forth in their complaint.

#### 1. Fargo Municipal Code § 10–0802 is Constitutional on its Face.

Fargo Municipal Code § 10–0802, like the antipicketing ordinance reviewed by the United States Supreme Court in *Frisby v. Schultz*, operates at the core of the First Amendment because it prohibits demonstra-

tors from picketing on an issue of public concern. *See Frisby v. Schultz,* 487 U.S. 474, 479, 108 S.Ct. 2495, 2499, 101 L.Ed.2d 420 (1988). In light of our nation's profound commitment to the principle that debate on public issues should be "uninhibited, robust, and wide-open", the United States Supreme Court has "traditionally subjected restrictions on public issue picketing to careful scrutiny." *Id.* at 479, 108 S.Ct. at 2499 (citations omitted). A picketer's right to demonstrate is not unlimited, however. *Id.* "[E]ven protected speech is not equally permissible in all places and at all times." *Id.* at 479, 108 S.Ct. at 2499 (citation omitted).

■ In defining the limits on protected speech, the United States Supreme Court has often focused on the nature of the forum the speaker seeks to employ. For example, in *Perry Education Association v. Perry Local Educators' Association,* the Court ruled that the rights of the State to restrict expressive activity in places traditionally devoted to assembly and debate, such as public sidewalks, is sharply circumscribed. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). In this case, plaintiffs limited their demonstration to public streets and sidewalks in a residential neighborhood. The *Frisby* Court clarified that residential antipicketing ordinances must be judged against the stringent standards established to test restrictions on speech in traditional public fora:

'In these quintessential public for[a], the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.... The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'

*Id.* at 481, 108 S.Ct. at 2500 (quoting *Perry,* 460 U.S. at 45, 103 S.Ct. at 954–55). The Court noted that "a public street does not lose its status as a traditional public forum simply because it runs through a residential neighborhood." *Frisby,* 487 U.S. at 480, 108 S.Ct. at 2500.

■ Since it is clear that plaintiffs were picketing in a traditional public forum, the next issue the court must consider is whether the Fargo ordinance is content-neutral. *See Frisby,* 487 U.S. at 481, 108 S.Ct. at 2500 ("As *Perry* makes clear, the appropriate level of scrutiny is initially tied to whether the statute distinguishes between prohibited and permitted speech on the basis of content."). Plaintiffs argue that Fargo Municipal Code § 10–0802 is unconstitutional on its face because it is content-based. Copper and Norberg acknowledge that the United States Supreme Court in *Frisby* found that an ordinance worded almost identically to the Fargo antipicketing ordinance was facially constitutional, but argue that "the problem of content neutrality arises in the definition section of Fargo Municipal Code § 10–0801(2)." (Pl.'s Mot. for Partial Summ.J. at 17). Section 10–0801(2) defines picketing as "the practice of standing, marching, or patrolling by one or more persons inside of, in front, or about any premises for the purpose of persuading an occupant of such premises or to protest some action, attitude or belief...." Fargo Municipal Code § 10–0801 (1985). Plaintiffs argue that the definition section, when considered in context with the antipicketing ordinance, impermissibly distinguishes between messages intended to inform and messages intended to persuade and between speech directed to an occupant and speech directed to a non-occupant of a residential dwelling. Since the ordinance permits speakers to convey some messages while forbidding other messages, plaintiffs contend that it is content-based and thus unconstitutional on its face.[6]

■ In First Amendment free speech cases such as the case at hand,

---

6. Plaintiffs appear to argue that a content-specific ordinance is invalid *per se.* This argument ignores the principle that the content-based statute may be upheld if the state can show that the

"regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry,* 460 U.S. at 45, 103 S.Ct. at 954–55.

[t]he principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others. Government regulation of expressive activity is content neutral so long as it is "justified without reference to the content of the regulated speech."

*Ward, et al. v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989) (citations omitted). The principal justification for and primary state interest served by the Fargo antipicketing ordinance is protection of the tranquility and privacy of the home.[7] This purpose/interest " 'ha[s] nothing to do with content,' and it satisfies the requirement that time, place, or manner regulations be content neutral." *Id.* at 792, 109 S.Ct. at 2754 (quoting *Boos v. Barry,* 485 U.S. 312, 320, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333 (1988)). *See also Madsen, et al. v. Women's Health Center, Inc.,* — U.S. —, —, 114 S.Ct. 2516, 2524, 129 L.Ed.2d 593 (1994) ("That petitioners all share the same viewpoint regarding abortion does not in itself demonstrate that some invidious content- or viewpoint-based purpose motivated the issuance of the order.") The court acknowledges that the antipicketing ordinance at issue in this case may have an incidental effect on some speakers or messages. However, since Fargo's purposes for promulgation of the ordinance are unrelated to the content of the expression it seeks to regulate, the court finds that the ordinance is content-neutral. Since the Fargo antipicket-

ing ordinance is content-neutral, the proper test to apply in evaluating the constitutional validity of the picketing ban is whether the ordinance is " 'narrowly tailored to serve a significant government interest' and whether it 'leaves[s] open ample alternative channels of communication.' " *Frisby,* 487 U.S. at 482, 108 S.Ct. at 2501 (quoting *Perry,* 460 U.S. at 45, 103 S.Ct. at 954–55).

■ Like the *Frisby* Court, this court will consider the precise scope of the ordinance before applying this balancing test. The ordinance reviewed in *Frisby* provided: "It is unlawful for any person to engage in picketing before or about the residence or dwelling of any individual in the Town of Brookfield." *Id.* at 477, 108 S.Ct. at 2498 (citation omitted). The district court and the court of appeals had described the Brookfield ordinance as one which banned "all picketing in residential areas." *Id.* at 482, 108 S.Ct. at 2501. Conversely, the United States Supreme Court determined that "the use of the singular form of the words 'residence' and 'dwelling' suggest[ed] that the ordinance [was] intended to prohibit only picketing focused on, and taking place in front of, a particular residence." *Id.* The Court noted that to the extent that the lower courts endorsed a broader reading of the ordinance, they "ran afoul of the well-established principle that statutes will be interpreted to avoid constitutional difficulties." *Id.* at 483, 108 S.Ct. at 2501 (citations omitted). Under the Court's narrow reading of the Brookfield ordinance, the antipicketing ban was a limited one; "only focused picketing taking place solely in front of a particular residence is prohibited." *Id.*

The *Frisby* Court gathered support for its narrow reading of the ordinance from repre-

---

7. Fargo Municipal Ordinance 2190, the ordinance that enacted article 10–12 of chapter 10 of the revised ordinances of 1965 of the City of Fargo (including Fargo Municipal Code §§ 10–0801 and 10–0802) relating to residential picketing, provides, in pertinent part:

Whereas, the protection and preservation of the home is the keystone of democratic government; and

Whereas, the public health and welfare and good order of the community require that citizens enjoy a feeling of well-being and tranquillity while in their homes; and

Whereas, it is imperative that when citizens are absent from their homes, they carry with them the sense of security inherent in the assurance that they may return to the enjoyment of their homes; and

Whereas, the practice of picketing before or about residences and dwellings causes emotional disturbance and distress to the occupants and has as its object, the harassing of such occupants; ...

Fargo Ordinance 2190 (adopted Feb. 1985).

sentations made by counsel for the Town of Brookfield. *Id.* The town indicated that it would take and enforce "a limited view of the 'picketing' proscribed by the ordinance.... General marching through residential neighborhoods, or even walking a route in front of an entire block of houses, is not prohibited by this ordinance." *Id.* (citations omitted).

Upon review of the antipicketing ordinance in this case and the principles set forth in *Frisby*, the court finds that Fargo Municipal Code § 10–0802 may be narrowly construed to avoid constitutional difficulties. The Fargo ordinance, like the Brookfield ordinance, uses the singular form of the word "dwelling," thereby indicating that the antipicketing ban is a limited one. Furthermore, the court finds that in order to avoid invalidation of the ordinance in its entirety, the court must construe the regulation to prohibit only picketing focused on, and taking place in front of, a particular residence.

■ Next, this court will consider whether the Fargo ordinance, as construed, leaves open ample alternative channels of communication. In considering this part of the balancing test, the Court in *Frisby* accepted the appellants' explanation that the limited nature of the picketing prohibition made it self-evident that ample alternative channels of communication remained:

> "Protesters have not been barred from the residential neighborhoods. They may enter such neighborhoods, alone or in groups, even marching.... They may go door-to-door to proselytize their views. They may distribute literature in this manner ... or through the mails. They may contact residents by telephone, short of harassment."

*Frisby*, 487 U.S. at 484, 108 S.Ct. at 2502 (citation omitted).

Similarly, this court finds that the Fargo antipicketing ordinance and accompanying definitions do not sweep all activities within reach of the ordinance. Pro-life demonstrators have not been barred from residential neighborhoods. They may enter Fargo neighborhoods, travel door-to-door, distribute literature in person or through the mail, and contact residents by telephone. The court is satisfied that the ordinance, as nar-

rowed, leaves open alternative channels of communication.

■ The next issue this court must address is whether Fargo Municipal Code § 10–0802 serves a significant government interest. Defendants assert that "the protection and the well-being, tranquility, and privacy of the home" is the government interest served by the ordinance. (Defs.' Br. in Opposition to Pls.' Mot. for Summ.J. at 3). The court agrees that the protection of residential privacy is, without question, a significant government interest.

■ Finally, this court must determine whether the Fargo antipicketing ordinance is narrowly tailored to serve the significant government interest in the protection of residential privacy. In other words, this court must decide whether the statute protects only unwilling recipients of the demonstrators' communication.

> A statute is narrowly tailored if it targets and eliminates no more than the exact source of the "evil" it seeks to remedy. A complete ban can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil.

*Frisby*, 487 U.S. at 485, 108 S.Ct. at 2502 (citation omitted). The Court in *Frisby* concluded that a complete prohibition of focused picketing taking place solely in front of a particular residence was necessary, and thus narrowly tailored:

> The type of focused picketing prohibited by the Brookfield ordinance is fundamentally different from more generally directed means of communication that may not be completely banned in residential areas. See, *e.g.*, *Schneider* [*v. State* ] *supra*, [308 U.S. 147,] at 162–163[, 60 S.Ct. 146, 151–152, 84 L.Ed. 155 (1939) ] (handbilling); *Martin* [*v. Struthers*, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943) ], *supra* (solicitation); *Murdock v. Pennsylvania*, 319 U.S. 105[, 63 S.Ct. 870, 87 L.Ed. 1292] (1943) (solicitation). See also *Gregory v. Chicago*, [394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969) ] *supra* (marching). Cf. *Perry* [*Education Assn. v. Perry Local Educators' Assn.*], 460 U.S. [37], at 45[, 103

S.Ct. 948, at 954–55, 74 L.Ed.2d 794] (in traditional public forum, "the government may not prohibit all communicative activity"). In such cases "the flow of information [is not] into ... household[s], but to the public." *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 420[, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1] (1971). Here, in contrast, the picketing is narrowly directed at the household, not the public. The type of picketers banned by the Brookfield ordinance generally do not seek to disseminate a message to the general public, but to intrude upon the targeted resident, and to do so in an especially offensive way. Moreover, even if some such picketers have a broader communicative purpose, their activity nonetheless inherently and offensively intrudes on residential privacy. The devastating effect of targeted picketing on the quiet enjoyment of the home is beyond doubt....

The First Amendment permits the government to prohibit offensive speech as intrusive when the "captive" audience cannot avoid the objectional speech.... The target of the focused picketing banned by the Brookfield ordinance is just such a "captive." ... Accordingly, the Brookfield ordinance's complete ban of that particular medium of expression is narrowly tailored.

*Frisby,* 487 U.S. at 486–88, 108 S.Ct. at 2503–04.

Like the *Frisby* Court, this court finds that Fargo Municipal Code § 10–0802, as construed, is narrowly tailored to protect only unwilling recipients of the communications." *Id.* at 485–88, 108 S.Ct. at 2502–04. Picketing focused on, and taking place directly in front of, a particular residence is inherently offensive and intrudes on the privacy of the home. *Id.* "The resident [who is the target of focused picketing] is figuratively, and perhaps literally, trapped within the home, and because of the unique and subtle impact of such picketing is left with no ready means of avoiding the unwanted speech." *Id.* at 487, 108 S.Ct. at 2503–04. The Fargo ordinance, as narrowed, only seeks to eliminate the "evil" presented by unwelcome residential picketers who are demonstrating solely in front of one home. Accordingly,

this court finds that the Fargo antipicketing ordinance is narrowly tailored to serve a substantial government purpose and that the ordinance, as narrowed, provides ample alternative channels of communication.

■ Plaintiffs also assert that the Fargo anti-picketing ordinance is unconstitutionally vague because it would be difficult for an average person to know whether the purpose of any given message is to inform or to persuade or to protest. Plaintiffs also contend that the protest/persuade standard is ambiguous and therefore subject to arbitrary enforcement.

■ The United States Supreme Court in *Kolender v. Lawson* noted that "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender, et al. v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983) (citations omitted). A statute will be held void for vagueness if the conduct forbidden by it is so unclearly defined that persons "of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). "[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). "Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, ... the more important aspect of the vagueness doctrine 'is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Kolender,* 461 U.S. at 357–58, 103 S.Ct. at 1858 (quoting *Smith v. Goguen,* 415 U.S. 566, 574, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974)). "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjec-

tive basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned,* 408 U.S. at 108–09, 92 S.Ct. at 2298–99 (footnote omitted).

Upon review of the provisions of the Fargo antipicketing ordinance, the court concludes that the Fargo ordinance sufficiently defines boundaries for citizens, police, juries, and appellate judges. *Grayned,* 408 U.S. at 109, 114, 92 S.Ct. at 2299, 2302 (citation and footnote omitted). Furthermore, the court finds that the ordinance, as narrowed, establishes minimal guidelines for law enforcement. Therefore, the court holds that Fargo Municipal Code § 10–0802 is not unconstitutionally vague.

In summary, this court finds that the Fargo antipicketing ordinance is constitutional on its face.

## 2. Fargo Municipal Ordinance 10–0802 is Unconstitutional as Applied.

Plaintiffs argue that defendants interpreted Fargo Municipal Code § 10–0802 to ban all residential picketing if the purpose of such demonstrations is to persuade an occupant of such premises or to protest some action, attitude or belief. According to plaintiffs, the City of Fargo's official policy for enforcing the ordinance disregarded the narrowing construction required by *Frisby.* Furthermore, plaintiffs contend that when Officers Niemann and Arnold arrested plaintiffs pursuant to this policy, their application of the ordinance was unconstitutionally overbroad because plaintiffs' demonstration did not take place solely in front of a particular residence. Accordingly, plaintiffs argue that the anti-picketing ordinance was unconstitutional as applied.

Fargo Municipal Code § 10–0802 provides: "No person shall engage in picketing the dwelling of any individual in the City of Fargo." When read in conjunction with § 10–0802 (definitions), the ordinance appears to ban all picketing initiated for the purposes of protesting some action or persuading an occupant of the dwelling picketed. Pursuant to *Frisby v. Schultz,* a total ban on residential picketing is unconstitutional. *Frisby,* 487 U.S. at 486, 108 S.Ct. at 2503. Therefore, in order to avoid constitutional difficulties, this court has construed the statute to prohibit only focused picketing taking place solely in front of a particular residence. Thus, the issue before this court is whether defendants properly applied the ordinance as narrowed.

Prior to the encounter between Stutlien and the juvenile picketer, all the demonstrators walked a picketing route that extended at least one city block in length and some picketers walked routes extending over two blocks.[8] Plaintiffs did not block or impede any person's access to or from private property and they remained silent during their picketing activities except when approached by others. (*See supra,* note 8). Plaintiffs made no more than momentary stops in front of any particular residence until their encounter with Marty Stutlien. *Id.* The picketers' demonstration, as described in the testimony and affidavits before the court, does not fall within the prohibition of the Fargo antipicketing ordinance as construed by this court.[9] Niemann and Arnold arrested plaintiffs despite the fact that plaintiffs' picketing did not take place solely in front of a particular residence. Accordingly, this court finds that when defendants arrested plaintiffs for violating Fargo Municipal Code § 10–0802, they enforced the ordinance in a manner that went beyond the scope of the narrowing construction set forth by this court. Thus, the ordinance is overbroad as applied to plain-

---

**8.** Defendants neither admitted nor denied this allegation. Further, they presented no evidence supporting or rebutting this claim. Since plaintiffs submitted the deposition testimony and affidavits in support of this allegation, the court will assume that plaintiffs' allegation is true for the purposes of this summary judgment motion.

**9.** Like the Cass County Court, this court finds: The path of the picketers was expansive, their conduct was orderly, they were on the public streets and sidewalk, and there is no evidence as to how many times they marched in front of any particular residence. The only evidence before the Court is that at any residence they only made "momentary" stops. There is no claim of excessive noise or any other threatening behavior.

*City of Fargo v. Copper, et al.,* No. CR–91–3466 & CR–91–3467 (Cass County Ct., N.D., Feb. 18, 1992).

tiffs. Defendants' enforcement of Fargo's antipicketing ordinance impermissibly infringed on plaintiffs' First Amendment rights.

Plaintiffs assert that if the court finds that the Fargo ordinance was unconstitutional on its face or as applied, they are entitled to summary judgment on the first cause of action alleged in their complaint. Plaintiffs' motion would have been granted if defendants had not claimed that they were entitled to qualified immunity from liability and damages. However, since defendants plead this affirmative defense, the court will defer ruling on plaintiffs' motion for summary judgment until after it considers defendants' qualified immunity arguments.

## C. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### 1. Qualified Immunity

Defendants argue that they are entitled to qualified immunity because the information available to the police officers at the time of the arrest led them to believe (and would have led a reasonable police officer to believe) that the picketers were directing their attention and efforts toward the home of Lynn Gifford. Since picketing a residential dwelling is prohibited by Fargo Municipal Code § 10–0802, defendants assert that a reasonable officer could have believed that plaintiffs' arrest was lawful.

In addition, defendants assert that controlling precedent does not clearly establish when a demonstrator may legally picket in a residential neighborhood. The Court in *Frisby v. Schultz* found that a Brookfield ordinance, similar to the Fargo residential picketing ordinance, was constitutional on its face when narrowly construed to ban "only focused picketing taking place solely in front of a particular residence." *Frisby,* 487 U.S. at 483, 488, 108 S.Ct. at 2501, 2504. However, the Court did not provide practical guidance about the application of the ordinance beyond the limited scope addressed in the *Frisby* opinion. Therefore, defendants assert that the scope of the plaintiffs' First Amendment right to picket in a residential

area was not clearly established under the circumstances presented in this case.

The purpose of the qualified immunity defense is to shield government officials who were exercising discretionary authority from civil damages liability, "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (citations omitted); *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). In *Latimore v. Widseth,* the Eighth Circuit Court of Appeals summarized the elements of the defense as follows:

> The availability of the defense to an official exercising discretionary authority in a particular case requires careful consideration of the established law at the time, the state actor's objective knowledge of that law, and the complained-of conduct. "Qualified immunity protects a government official from suit if, at the time of the challenged acts, it was not clearly established that those actions would violate clearly established law of which a reasonable person would have known."

*Latimore v. Widseth,* 7 F.3d 709, 712 (8th Cir.1993) (citation omitted).

In deciding whether defendants are entitled to qualified immunity, the first issue to resolve is whether plaintiffs have alleged a violation of a constitutional right. *Siegert v. Gilley,* 500 U.S. 226, 231, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). In this case, plaintiffs contend that defendants violated their First, Fourth and Fourteenth Amendment rights when Niemann and Arnold arrested them for picketing on public sidewalks and streets. Public sidewalks have long been a place for public assembly and discourse. *Frisby,* 487 U.S. at 480–81, 108 S.Ct. at 2500. "In these quintessential public forums the government may not prohibit all communicative activity." *Id.* Furthermore, "a public street does not lose its status as a traditional public forum simply because it runs through a residential neighborhood." *Frisby,* 487 U.S. at 480, 108 S.Ct. at 2500. Accordingly, the court finds that plaintiffs

have sufficiently alleged a violation of their constitutional rights.

■ The next issue is whether plaintiffs' constitutional right to picket in a residential neighborhood was clearly established. For purposes of qualified immunity, a right is clearly established if a reasonable official would understand that his or her conduct violates that particular right because the contours of the right are sufficiently clear. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.*

The Court has previously invalidated complete bans on expressive activity in residential neighborhoods. *Frisby*, 487 U.S. at 480, 485, 108 S.Ct. at 2500, 2502. In doing so, the court recognized that public streets and sidewalks, even in residential neighborhoods, are the archetype of a traditional public forum and therefore restrictions on the use of this forum for picketing on an issue of public concern are subject to careful scrutiny. *Id.* at 479–81, 108 S.Ct. at 2499–2500. In *Frisby v. Schultz*, the court construed an ordinance almost identical to the Fargo antipicketing ordinance to ban only focused picketing taking place solely in front of a particular residence. Although the judiciary may not have analyzed the Fargo ordinance for constitutional validity before this case, the court finds that the Supreme Court's decision in *Frisby*, clearly established plaintiffs' right to picket in a Fargo residential neighborhood.

Defendants acknowledge that the *Frisby* Court provided guidelines for analyzing the facial validity of the Fargo ordinance, but argue that the *Frisby* decision did not define the scope of permissible picketing under the ordinance and therefore questions about the constitutional application of the ordinance still remain. In support of their argument, defendants note that the Seventh Circuit Court of Appeals, upon remand, commented that the *Frisby* Court left many questions unanswered:

We appreciate the Plaintiff's concern that it is hard to tell when picketing is "directed at" a particular home. Will it be enough to go around and around the block? Could the picketers march in front of five houses on either side of the Victoria's? Make a stop for one minute, or two, or five, in front of the Victoria's place before moving on? Surely they can't evade the law by standing in front of the Victoria's home and occasionally jumping one house on either side. How much longer must the route be? No matter how clear the ordinance seems, 100 nice questions may follow its wake.

*Schultz v. Frisby*, 877 F.2d 6, 8 (7th Cir. 1989). Defendants also cite to the following passage from the *Frisby* decision: "[S]ince our First Amendment analysis is grounded in protection of the unwilling residential listener, the constitutionality of applying the ordinance to such hypothetical [situations] remains open to question." (Br. in Support of Defs.' Mot. for Summ.J. at 8–9 (quoting *Frisby*, 487 U.S. at 488, 108 S.Ct. at 2504)). In addition, defendants note that Judge Racek, the Cass County Court judge who dismissed the criminal charges against plaintiffs, admitted that the question of whether the Fargo ordinance was constitutional as applied to the circumstances in this case was troublesome. Since the *Frisby* Court did not provide any practical guidance about the application of the narrowly construed antipicketing ordinance, defendants argue that plaintiffs' constitutional right to picket under the circumstances of this case was not clearly established.

■ The court is not persuaded by defendants' arguments. It is not necessary for a litigant to demonstrate precise factual correspondence with precedents in order to prove that the law was clearly established for qualified immunity purposes. *Jones v. Coonce*, 7 F.3d 1359, 1362 (8th Cir.1993). "It is only necessary that the unlawfulness of the official's act is apparent in view of preexisting law." *Id.* The court finds that the unlawfulness of defendants' arrest of plaintiffs was apparent in light of *Frisby*. The similarity of the Brookfield and Fargo ordinances put defendants on notice that the Fargo ordinance was overbroad as written. The *Frisby* Court

avoided constitutional difficulties presented by the Brookfield ordinance by construing the antipicketing ban to prohibit only focused picketing taking place solely in front of a particular residence. *Frisby*, 487 U.S. at 483, 108 S.Ct. at 2501. This narrowing construction clearly established the standard for analogous cases.[10] Defendants have not set forth any facts that convince this court that it should not narrowly construe the Fargo ordinance in the same manner that the Court narrowly construed the Brookfield ordinance in *Frisby*. To the contrary, it appears that the purpose for the adopting the Fargo and Brookfield antipicketing ordinances and the state interests asserted by Town of Brookfield and the City of Fargo are nearly identical. In addition, this court found no special circumstances that would lead a reasonable officer to conclude that this case presented an exception to the principles discussed in *Frisby*. Therefore, the court finds that defendants should have known that the Fargo ordinance would eventually be narrowly construed to prohibit only picketing focused solely on a particular residence.

Furthermore, the court is not convinced that the circumstances in the case at hand present a close call with regard to constitutional application of the statute. In order to save the ordinance from invalidation on constitutional grounds, the *Frisby* Court construed the Brookfield antipicketing ban to be a limited one. *Frisby*, 487 U.S. at 483, 108 S.Ct. at 2501. In reaching this decision, the court was persuaded by counsel for the Town of Brookfield, who assured the Court that "[g]eneral marching through residential neighborhoods, or even walking a route in front of an entire block of houses was not prohibited by the ordinance." *Id.* Assuming that Niemann and Arnold knew the extent of the demonstrators' picketing route and man-

ner of their demonstration, the court finds that the illegality of plaintiffs' arrest was obvious. The picketers' route was at least a block long, extending well beyond one particular residence. The picketers' conduct was orderly. The demonstration was limited to public property and the court is aware of no claims of excessive noise or threatening behavior. Accordingly, the court finds that plaintiffs' constitutional right to picket in the manner described by plaintiffs in their affidavits and depositions was clearly established.

▇▇▇▇ Allegations of a well-established constitutional right do not automatically defeat a motion for summary judgment on qualified immunity grounds, however. The qualified immunity defense may still be viable even when the plaintiff establishes the violation of a clearly established constitutional right, if the defendant can demonstrate the "objective legal reasonableness" of the policy or conduct in light of the legal principles that were "clearly established" at the time the alleged violation occurred. *Latimore*, 7 F.3d at 712 (citing *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039. Thus, the court must not only consider whether the right allegedly violated was clearly established, but must also consider whether the right was clearly established in these particular circumstances. *Id.* at 640–42, 107 S.Ct. at 3039–40. Although it may be clear that plaintiffs have a general right to picket on public sidewalks and streets, it may not be clear that defendants violated plaintiffs' constitutional rights when they arrested plaintiffs for picketing in a residential neighborhood on August 20, 1991.[11]

**10.** The United States District Court in *Vittitow, et al., v. City of Upper Arlington*, 830 F.Supp. 1077 (S.D.Ohio, E.D.1993), also recognized the precedental effect of *Frisby:*

[I]n *Frisby*, unlike the instant case, the plaintiffs challenged the facial validity of the ordinance. The Court nevertheless finds the principles enunciated in *Frisby* to be highly instructive in the instant case. In particular, the limitations the *Frisby* Court read into the Brookfield ordinance serve as a fair guide as to

the extent to which defendants in the instant case may constitutionally enforce the Upper Arlington ordinance.
*Id.* at 1080.

**11.** The court in *Myers v. Morris* noted:

In *Mitchell v. Forsyth*, for example, the fourth amendment right to be free from unreasonable searches was certainly clearly established when the attorney general ordered wiretaps. What was not clearly established was whether

Furthermore, in a case in which the defense of qualified immunity is raised in response to an allegation of illegal arrest under the Fourth Amendment, the "focal issue is the objective reasonableness of the officer making the arrest, even though probable cause to arrest is lacking." *Gainor v. Rogers,* 973 F.2d 1379, 1382 (8th Cir.1992). The relevant question is whether a reasonable officer could have believed that plaintiffs' arrest was lawful, in light of clearly established law and the information Niemann and Arnold possessed. *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *Gainor,* 973 F.2d at 1384. The latter phase of this test allows room for good faith mistake since the officer's "conduct must be measured in terms of the belief of a reasonable officer based upon the facts then available to the officer." *Gainor,* 973 F.2d at 1384. Naturally, an officer cannot claim qualified immunity if the officer based his or her decision to arrest on mere suspicion that unlawful conduct had occurred. But, "if the officer asserted conduct which would give rise to probable cause, this would, if undisputed, provide a defense of qualified immunity. However, if the plaintiff contested the officer's observations and offered a factual account which would not justify a reasonable officer to make an arrest, then a material dispute of fact would exist.... Once a genuine issue of material fact is found to exist, the defense of qualified immunity shielding the defendant from trial must be denied." *Id.* at 1384–85.

the specific conduct in the context indicated (warrantless wiretapping for domestic national security purposes) was clearly constitutionally proscribed. *See also Davis v. Scherer,* 468 U.S. 183, [199,] 104 S.Ct. 3012, 3022, 82 L.Ed.2d 139 (1984) (Brennan, J., concurring in part and dissenting in part):

In order to determine whether a defendant has violated a plaintiff's clearly established rights, it would seem necessary to make two inquiries * * *: (1) which particular act or omission of the defendant violated the plaintiff's federal rights, and (2) whether governing case or statutory law would have given a reasonable official cause to know, at the time of the relevant events, that those acts or omissions violated the plaintiff's rights.

*Myers v. Morris,* 810 F.2d 1437, 1459 n. 16 (8th Cir.1987).

In this case, plaintiffs assert that their First Amendment rights were violated when defendants arrested them for picketing in a residential area even though the plaintiffs' picketing route extended at least one city block. Since the observations of the defendants, combined with the other information they possessed, may determine whether they are entitled to qualified immunity, the court will separately analyze the evidence as it pertains to each defendant. *See Gainor v. Rogers,* 973 F.2d 1379, 1384 (8th Cir.1992) ("[I]n evaluating qualified immunity under a motion for summary judgment the court must examine the information possessed by the officials.").

### a. *Defendant Niemann*

Defendant Niemann contends that when he arrived at the scene of the incident, he observed the picketers standing in a group near Gifford's residence. He did not see the picketers walking a particular route in front of an entire block of houses. Additionally, Niemann testified that he cannot remember any of the picketers explaining that they had been walking a picketing route which extended for at least a block and that they only stopped momentarily because of the confrontation between Stutlien and a juvenile picketer. Furthermore, Niemann did not learn about the picketing route from bystanders or other police officers before the arrests.[12] Therefore, defendant argues that the events he observed and the information he possessed before arresting the picketers led him to the conclusion that the picketers' demon-

12. Niemann and Arnold testified that they handled the situation like a domestic dispute. (Test. of Kevin Niemann, 12/1/94; Test. of Sherri Arnold, 12/1/94). Niemann talked with the demonstrators and Arnold questioned Stutlien. (Id.) After the officers completed their interviews, they allegedly conferred for a few moments. (Test. of Kevin Niemann, 12/1/94). Arnold and Niemann did not recall discussing the demonstrators' picketing route during this conversation. (Test. of Kevin Niemann, 12/1/94; Test. of Sherri Arnold, 12/1/94). Niemann did not ask Arnold about the picketers' route, and Arnold did not volunteer this information. (Test. of Kevin Niemann, 12/1/94). The officers' conversation allegedly focused on the exchange between Stutlien and the juvenile picketer. (Id.).

stration was focused on the Gifford residence.

Conversely, plaintiffs assert that Niemann either knew that the picketers' demonstration extended beyond the Gifford residence or should have asked questions which would have resulted in the discovery of this information. Copper testified that he informed Niemann of his belief that according to a United States Supreme Court decision, he and the other demonstrators could legally picket in a residential area if they walked a certain distance, spaced themselves a certain distance apart and continually moved silently past a certain number of dwellings. (Depo. of Gilbert Copper, dated Apr. 20 & 21, 1994, at 101; Copper Aff. at 2). Copper also testified that he began to explain the scope and distance of the demonstrators' picketing route to Niemann, but Niemann turned his back on Copper and walked away.[13] (Test. of Gilbert Copper, 12/1/94). Copper allegedly followed Niemann and continued to explain the picketing route while he walked. (*Id.*). Furthermore, plaintiffs contend that even if Niemann did not hear all of Copper's statements, defendants Niemann and Arnold had a duty to investigate further before arresting plaintiffs for violating the anti-picketing ordinance.

Upon review of the evidence before the court and the parties' briefs, the court finds that the parties disagree about whether Officer Niemann knew that the picketers' demonstration extended beyond the area directly in front of Gifford's residence. In addition, the court finds that this factual dispute is material because the resolution of this issue will determine whether defendant Niemann is entitled to qualified immunity. "A dispute is genuine when 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Westchem Agr. Chemicals, Inc. v. Ford Motor Co.*, 990 F.2d 426, 429 (8th Cir.1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).

If the jury is persuaded by defendants' version of the facts and concludes that Niemann knew only that the picketers participated

in a demonstration encompassing an area in front of Gifford's residence, then the court finds that a reasonable officer could have believed the arrest was lawful. "The issue for immunity purposes is not probable cause in fact but 'arguable' probable cause." *Myers v. Morris*, 810 F.2d 1437, 1455 (8th Cir.1987) (citation omitted). "Thus, even if probable cause is in fact absent, defendants may be entitled to qualified immunity." *Arnott v. Mataya*, 995 F.2d 121, 123 (8th Cir. 1993).

In this case, Niemann observed the picketers standing near the Gifford residence. He did not observe them walking a route extending a block or more in length. After the demonstrators noticed his arrival, they allegedly "scurried" northbound on Third Street, which may have led a reasonable police officer to conclude that the demonstrators realized their picketing was unlawfully focused on one residence and attempted to remedy the problem. Furthermore, according to Niemann, he received no information about the extent of the picketing route from the protestors, spectators or fellow police officers. Based on Officer Nieman's account, the court finds that a reasonable police officer could have believed the arrest was lawful, in light of *Frisby* and the information Niemann possessed.

■■■ During the hearing conducted on December 1, 1994, plaintiffs argued that even if Niemann was not informed about the picketing route, he had a duty to ask the plaintiffs questions about the scope of their demonstration before arresting them for violating the anti-picketing ordinance. The court is not persuaded by plaintiffs' argument. "[A]n imperfect investigation without more does not deprive the investigators of qualified immunity." *Myers v. Morris*, 810 F.2d 1437, 1460 (8th Cir.1987). Furthermore, the qualified immunity doctrine allows ample room for an officer's good faith mistakes. *Gainor v. Rogers*, 973 F.2d 1379, 1384 (8th Cir.1992). Although it may have been prudent for Niemann to ask the picketers questions, the court refuses to deny immunity based on this

---

13. Copper estimated that he explained that the picketers walked down Seventh Avenue and

through the Third Street alley before Niemann turned away. (Test. of Gilbert Copper, 12/1/94).

decision alone. The issue this court must consider is "whether the [officers] acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable interpretation of the events can be construed ... years after the fact." *Gainor*, 973 F.2d at 1383 (citing *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991)). Accordingly, the court finds that if the jury is persuaded by Niemann's version of the events, then a reasonable officer could have found that there was probable cause to arrest the protesters.

Conversely, if the jury is persuaded that Niemann possessed information about the scope and distance of the picketers' demonstration route before he made the arrest, then, viewing the facts in the light most favorable to the plaintiffs, the court concludes that a reasonable officer could not have believed the arrest was lawful. As noted above, the law clearly proscribed the arrest of plaintiffs for walking the picketing route alleged in their complaint. A reasonable police officer, considering the circumstances and the information conveyed to him by plaintiff Copper, could not have found that there was probable cause to arrest plaintiffs for violating Fargo's anti-picketing ordinance.

In summary, defendants' motion for summary judgment is denied with respect to their argument that defendant Niemann is entitled to qualified immunity at this stage of the proceeding. The court finds that the evidence submitted presents a genuine factual dispute requiring a jury to assess the credibility of witnesses and resolve inconsistencies in the evidence. The court will rule on whether defendant Niemann is entitled to qualified immunity from damages after the jury resolves the remaining factual disputes. *Guffey v. Wyatt*, 18 F.3d 869, 873 (10th Cir. 1994); *Feliciano–Angulo v. Rivera–Cruz*, 858 F.2d 40, 48 (1st Cir.1988). Accordingly, defendant Niemann's motion for summary judgment on plaintiffs' federal constitutional claims is denied.

### b. *Defendant Arnold*

Defendant Arnold contends that she did not observe the picketers walking a particular route in front of an entire block of houses. In addition, Arnold testified that she could not recall any demonstrators talking to her prior to their arrest about their picketing route. (Test. of Sherri Arnold, 12/1/94).[14] Arnold explained that she spent most of her time talking with Stutlien, and very little time (if any) talking with the picketers. (*Id.*) Arnold acknowledged that she may have discussed the situation with Niemann, but testified that she doubted that the demonstrators' picketing route was mentioned during their conversation.[15] (*Id.*) Arnold also testified that she believed the demonstration was limited to one area and that she had no knowledge about the entire picketing route until after plaintiffs had been arrested and taken to the station house. (*Id.*).

Plaintiffs conceded that they did not talk to Arnold about the picketing route. Copper testified that he did not speak to Arnold at all. (Test. of Gilbert Copper, 12/1/94). Norberg testified that she had a short conversation with Arnold in the squad car on the way to the police station, but they did not discuss the demonstrators' picketing routes. (Test. of Adele Norberg, 12/1/94). Accordingly, defendant Arnold argues that the events she observed and the information she possessed before assisting Niemann in his arrest of the picketers led her to the conclusion (and would have led a reasonable person to the conclusion) that the picketers' demonstration took place solely in front of the Gifford residence.

Upon review of the evidence and briefs submitted by the parties, the court finds that a reasonable officer could have believed that plaintiffs' arrest was lawful in light of clearly established law and the information Arnold possessed. Arnold did not see the demonstrators walking a route that extended beyond the area in front of Gifford's residence

---

**14.** Arnold testified that she cannot remember any of the picketers explaining that they had been walking a picketing route which extended for no less than a block and that they only stopped momentarily because of the confrontation be-

tween Stutlien and a juvenile picketer. (Test. of Sherri Arnold, 12/1/94).

**15.** *See supra* note 12.

and did not learn about the route until after plaintiffs' arrest. In addition, Arnold testified that she believed the demonstration was limited to one area. Furthermore, Arnold did not make the decision to arrest; she simply assisted Niemann after he placed plaintiffs under arrest. "If a case involves a question of whether probable cause existed to support an officer's actions, the case should not be permitted to go to trial if there is any reasonable basis to conclude that probable cause existed." *Cross v. City of Des Moines,* 965 F.2d 629, 632 (8th Cir.1992) (citations omitted). Accordingly, the court finds that Arnold is entitled to qualified immunity for her participation in plaintiffs' arrest.[16]

In summary, defendants' motion for summary judgment on the federal constitutional law claims against defendant Arnold is granted. Therefore, the only claims pending against Arnold are the state law claims of malicious prosecution and false arrest/false imprisonment.

### 2. Liability of the City of Fargo

■ In their complaint, plaintiffs allege that the City of Fargo failed to train and advise its police officers and that this failure constituted deliberate indifference to plaintiffs' clearly established constitutional rights. In addition, plaintiffs claim that the city's failure to train and advise the officers was the direct and proximate cause of the deprivation of rights suffered by plaintiffs. Further, plaintiffs contend that defendants Ar-

nold and Niemann's conduct was authorized, sanctioned, and ratified by city officials functioning at a policy-making level for the City of Fargo and that Arnold and Niemann's actions were performed pursuant to official policies and customs of the City of Fargo. Therefore, plaintiffs allege that the city is liable for plaintiffs' damages.

In response to these allegations, defendants filed a motion for summary judgment arguing that the claims against the City of Fargo should be dismissed because the city's alleged failure to properly train and supervise the police officers did not amount to deliberate indifference to the rights of the picketers.

Upon review of the evidence and briefs before the court, the court finds that the resolution of defendants' motion for summary judgment on the issue of municipal liability will depend on the resolution of the factual disputes presented to the jury. Accordingly, the court will defer ruling on this issue until after the facts are decided.

The parties shall prepare proposed jury instructions addressing municipal liability questions in the event that the jury is persuaded by plaintiffs' version of the facts and in the event the court finds that it is unable to resolve the municipal liability issue as a matter of law.

### 3. State Law Claims [17]

In their complaint, plaintiffs allege that defendants are liable for malicious prosecu-

---

**16.** Plaintiffs also argued that Arnold had a duty to ask plaintiffs questions about the scope of their demonstration before assisting Niemann in their arrest. As noted in this court's analysis of the qualified immunity defense with respect to defendant Niemann, "an imperfect investigation without more does not deprive the investigators of qualified immunity." *Myers v. Morris,* 810 F.2d 1437, 1460 (8th Cir.1987). Although it may have been prudent for Arnold to ask the picketers questions, the court refuses to deny immunity based on this decision alone, especially when Arnold did not participate in the decision to arrest plaintiffs. The issue this court must consider is whether Officer Arnold acted reasonably under the circumstances, not whether another more reasonable interpretation of the events can be construed over three years after the fact. *Gainor v. Rogers,* 973 F.2d 1379, 1384 (8th Cir. 1992).

**17.** Pursuant to 28 U.S.C. § 1367(a) and the Eighth Circuit Court of Appeals decision in *McLaurin v. Prater,* 30 F.3d 982, 985 (8th Cir. 1994), this court *must* accept supplemental jurisdiction over the state law claims in this action unless:

(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
(3) the district court has dismissed all claims over which it has original jurisdiction, or
(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367 (1994). Since this court concludes that none of the exceptions listed above apply to the circumstances of this case, it must

tion and false arrest/false imprisonment under the laws of the State of North Dakota. Defendants filed a motion for summary judgment arguing that plaintiffs have failed to make a showing sufficient to establish the existence of two elements necessary to maintain an action for malicious prosecution: absence of probable cause for the proceeding and malice.

In response to defendants' argument, plaintiffs argue that defendants' conduct was malicious. They base their claim on the following testimony of Gilbert Copper:

> Q. Is it fair to say, Mr. Copper, that in your arrest in Fargo back in August of 1991 the officers were considerate in the manner in which they arrested you?
>
> A. I think in my answers I referred to Adele's statement which said specifically the malice of the police officers and their disregard for my rights and those of all the pro-lifers present was best represented in the way the police ignored James' complaints as he stood there in his torn shirt. Clearly the victim of violence. The police demonstrated a one-track mind throughout the incident, intent only on interfering with our protest and getting us out of the neighborhood. They demonstrated no concern for the misconduct of others. They [neighborhood residents, not the police] tore signs out of our hands, sprayed us with a hose, and physically assaulted James. The police seemed utterly uninterested in the truth of what we were saying about how we had been attacked.
>
> I would say that to myself no physical force was used. There was a total disregard of anything we said. Totally. And total disregard of any of our requests. I do not think we were treated in a respectful and considerate manner.

(Depo. of Gilbert Copper, Apr. 20 & 21, 1994, at 48–49).

■ In order to maintain an action for malicious prosecution under North Dakota law, one must establish the following elements:

1. A criminal proceeding instituted or continued by the defendant against the plaintiff.

2. Termination of the proceeding in favor of the accused.

3. Absence of probable cause for the proceeding.

4. "Malice," or a primary purpose other that of bringing an offender to justice.

*Richmond v. Haney*, 480 N.W.2d 751, 755 (N.D.1992) (citations omitted). Upon review of the evidence, the court finds that Copper's testimony, standing alone, is not sufficient to establish malicious intent. Copper's statements about the police showing a lack of interest in the misconduct of others and the police focusing on "interfering with our protest and getting us out of the neighborhood" fail to establish malice or a primary purpose other than bringing an offender to justice. The evidence before the court demonstrates that Niemann believed plaintiffs' demonstration was illegal. (Aff. of Kevin Niemann, dated 6/10/94, at 3–4). His purpose for arresting plaintiffs was to bring people he thought were breaking the law to justice and Arnold's purpose was to assist Niemann in his endeavor. Copper's statements are not inconsistent with these purposes. Since plaintiffs presented no other evidence in support of their claim that defendants' conduct was malicious, the court finds that defendants are entitled to summary judgment on this state law cause of action.

■ Plaintiffs also allege that defendants are liable for false arrest/false imprisonment. In order to prove their claim, plaintiffs must demonstrate that they were subject to total restraint against their will by means of physical barriers or by threats of force which intimidated them into compliance with orders. W. Page Keeton et al., Prosser and Keeton on Torts § 11, at 47–53 (Hornbook Series, Lawyer's Edition, 5th ed. 1984). However, plaintiffs are not entitled to recover if the arrest is supported by proper legal authority. *Id.* Probable cause may also serve as a defense if it validates the arrest itself or if it justifies defense of person or property. *Id.*

accept jurisdiction over the state law claims alleged by plaintiffs.

■ Defendants do not contend that plaintiffs have failed to establish the elements of false arrest/false imprisonment. Instead, defendants assert that pursuant to section 32–12.1–03(3) of the North Dakota Century Code,[18] they are immune from liability for plaintiffs' state law claims because Niemann's decision to arrest plaintiffs for violating Fargo's antipicketing ordinance was discretionary.

In response to defendants' argument, plaintiffs contend that their allegations of malicious conduct deprive city defendants of invoking the "due care" immunity provisions of section 32–12.1–03. Furthermore, plaintiffs assert that section 32–12.1–04(3) explicitly provides that employees of a political subdivision may be held liable for compensatory and punitive damages when their actions or omissions "constitute reckless or grossly negligent conduct, or willful or wanton misconduct." N.D.Cent.Code § 32–12.1–04(3) (Supp.1993).[19]

The court is not persuaded by plaintiffs' arguments. Plaintiffs have not proffered any evidence of malicious intent, reckless or grossly negligent conduct, or willful or wanton conduct. Mere allegations of malicious conduct are not enough to withstand defen-

dants' motion for summary judgment. Fed. R.Civ.Pro. 56(e).

Furthermore, the court is not convinced that plaintiffs have correctly interpreted the "due care" immunity provisions set forth in section 32–12.1–03 of the North Dakota Century Code.

Until April 8, 1975, municipal corporations were not liable in tort. On December 5, 1974, [the North Dakota Supreme Court], in *Kitto v. Minot Park District*, 224 N.W.2d 795 (N.D.1974), declared that governmental immunity was abolished in North Dakota, with three important exceptions: ... third, the right to recover in tort against local governments or political subdivisions was subject to certain limitations:

"A further limitation on the scope of decision should be observed. In certain other jurisdictions abolishing the doctrine, an immunity has been retained for certain acts which go to the essence of governing.... We do not contemplate that the essential acts of governmental decision-making be the subject of judicial second-guessing or harassment by the actual or potential threat of litiga-

---

18. Section 32–12.1–03(3) provides, in pertinent part:

    3. A political subdivision is not liable for any claim based upon an act or omission of an employee of a political subdivision, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance, exercising due care, or the failure to exercise or perform a discretionary function or duty on the part of a political subdivision or its employees, whether or not the discretion involved be abused. Specifically, a political subdivision or an employee thereof is not liable for any claim which results from:

    .    .    .    .    .

    c. The decision to perform or the refusal to exercise or perform a discretionary function or duty, whether or not such discretion be abused and whether or not the statute, charter, ordinance, order, resolution, regulation, or resolve under which the discretionary function or duty is performed is valid or invalid.

N.D.Cent.Code § 32–12.1–03 (Supp.1993).

19. Section 32–12.1–04(3) of the North Dakota Century Code provides:

3. No employee may be held liable in the employee's personal capacity for acts or omissions of the employee occurring within the scope of the employee's employment unless the acts or omissions constitute reckless or grossly negligent conduct, or willful or wanton misconduct. An employee may be personally liable for money damages for injuries when the injuries are proximately caused by the negligence, wrongful act, or omission of the employee acting outside the scope of the employee's employment or office. The plaintiff in such an action bears the burden of proof to show by clear and convincing evidence that the employee was either acting outside the scope of the employee's employment or office or the employee was acting within the scope of employment in a reckless, grossly negligent, or willful, or wanton manner. Employees may be liable for punitive or exemplary damages. The extent to which an employee may be personally liable pursuant to this section and whether the employee was acting within the scope of employment or office shall be specifically stated in a final judgment.

N.D.Cent.Code § 32–12.1–04(3) (Supp.1993).

tion. We hold that no tort action will lie against governmental units for those acts which may be termed discretionary in character. Included within this category are acts traditionally deemed legislative or quasi-legislative, or judicial or quasi-judicial, in nature. The exercise of discretion carries with it the right to be wrong. It is for torts committed in the execution of the activity decided upon that liability attaches, not for the decision itself. In this regard there is substantial experience in dealing with a discretionary function exception under the Federal Tort Claims Act, which may provide a useful source of reference...."

At the Forty-fourth Legislative Assembly (1975), the Legislature responded to the *Kitto* case by enacting a statute effective April 8, 1975, providing for limitations on municipal tort liability.

*Sande v. City of Grand Forks*, 269 N.W.2d 93, 96 (N.D.1978) (quoting *Kitto v. Minot Park District*, 224 N.W.2d 795 (N.D.1974)). The statute enacted in 1975 is essentially the same as chapter 32–12.1 of the North Dakota Century Code which is in effect today. Section 32–12.1–03(3)(c) sets forth the discretionary function exception to liability of a political subdivision. The North Dakota Supreme Court has interpreted this subsection to provide political subdivisions and their employees immunity from liability for allegations of negligence in the exercise of a discretionary function. *Sande v. City of Grand Forks*, 269 N.W.2d 93, 98 (N.D.1978); *McLain v. Midway Township*, 326 N.W.2d 196, 199 (N.D. 1982). Therefore, defendants are immune from liability for plaintiffs' state law claims, regardless of whether Niemann and Arnold were negligent or whether they exercised due care, provided that defendants can dem-

onstrate that Niemann's decision to arrest plaintiffs was a discretionary function.[20]

Upon review of the circumstances of this case and the factors set forth in *Loran v. Iszler*, 373 N.W.2d 870, 873 (N.D.1985) (quoting Comment f to § 895D, Restatement (Second) of Torts), the court finds that Niemann's conclusion that there was probable cause to arrest plaintiffs and his consequent decision to arrest Copper and Norberg was discretionary. There is a substantial amount of independent judgment required to make a decision to arrest or to conclude whether probable cause exists. *See Richmond v. Haney*, 480 N.W.2d 751, 759 (N.D.1992). Accordingly, defendants are immune from liability for plaintiffs' state law claims of malicious prosecution and false arrest/false imprisonment under section 32–12.1–03 of the North Dakota Century Code. Defendants' motion for summary judgment on plaintiffs' state law claims is therefore granted.

### 4. Punitive Damages

■ Plaintiffs' prayer for relief includes a demand for punitive damages against defendants Niemann and Arnold.[21] In response to this demand, defendants argue: "There is absolutely nothing in the Complaint nor in the facts of this case which justify an award of punitive damages against the arresting officers. The request for punitive damages should be stricken." (Br. in Support of Defs.' Mot. for Summ.J. at 18). Plaintiffs counter this argument by asserting that allegations of malice are sufficient to withstand dismissal of their punitive damages claim on summary judgment.

Upon review of the documents submitted in support of the cross motions for summary judgment, the court finds that plaintiffs have failed to make a showing sufficient to withstand defendants' motion for summary judgment on this issue. The only evidence before

---

**20.** Legislative history supports this interpretation of section 32–12.1–03. During the discussion of house bill 1071, the bill which lead to the enactment of chapter 32–12.1, Mr. Russ Myhre of the Legislative Council stated that "generally, state or political subdivision officers and employees who exercise discretionary functions are immune from liability for their unintentional fault." Senate Judiciary Committee Discussion of House Bill 1071 at 2 (March 7, 1977).

**21.** Although a political subdivision may not be held liable for punitive damages, employees of a political subdivision may be held liable for punitive or exemplary damages. N.D.Cent.Code §§ 32–12.1–03(2) & 32–12.1–04(3) (Supp.1993). Therefore, plaintiffs sought punitive damages from defendants Niemann and Arnold only.

this court which could arguably support a claim for punitive damages is Copper's testimony submitted in support of plaintiffs' malicious prosecution cause of action. However, the court has previously found that Copper's statements were insufficient to establish malice and now finds that his testimony is insufficient to support a punitive damages award.

Plaintiffs also argue that a mere allegation of malice is sufficient to withstand summary judgment. Plaintiffs are mistaken. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.Pro. 56(e). Accordingly, this court finds that plaintiffs have failed to make a showing sufficient to justify an award of punitive damages. Defendants' motion for summary judgment with respect to plaintiffs' demand for punitive damages is granted.

**IT IS ORDERED** that:

1. Defendants' motion for summary judgment (doc. # 14) is granted with respect to federal constitutional law claims against Arnold, plaintiffs' state law claims against all defendants and plaintiffs' demand for punitive damages. Defendants' motion for summary judgment (doc. # 14) is denied with respect to federal constitutional claims against Niemann and the City of Fargo.

2. Plaintiffs' motion for partial summary judgment (doc. # 21) is denied.

3. Plaintiffs' motion for leave to file a reply brief to defendants' motion for summary judgment (doc. # 34) is granted.